**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 00-50602

KENNETH L. COFFEL,

Plaintiff-Appellant, Cross-Appellee,

versus

STRYKER CORPORATION,

Defendant-Appellee, Cross-Appellant.

Appeals from the United States District Court
for the Western District of Texas

March 14, 2002

Before HIGGINBOTHAM, BARKSDALE, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Following a jury finding for Kenneth Coffel ("Coffel") on claims for fraud and breach of contract, Magistrate Judge Albright's ruling on Stryker Corporation's ("Stryker") Rule 50(b) motion reversing the fraud finding and upholding the breach of contract finding, and Magistrate Judge Austin's award of attorneys' fees, both parties appeal portions of the district court's judgment. Coffel contends on appeal that the district court erred in applying the Rule 50(b) standard, in finding insufficient evidence to support fraud and associated compensatory and punitive damages, as well as in reducing the amount of attorneys' fees awarded him. Stryker cross-appeals, arguing that the

district court erred in finding sufficient evidence to support Coffel's contract claim.[1] We reverse the fraud finding, affirm the contract finding, and remand for recalculation of attorneys' fees.

FACTUAL AND PROCEDURAL BACKGROUND

As a long-time regional sales manager for Stryker's Medical Division for the Southwest Sales Region, Coffel managed territory managers throughout his sales region. Regional managers received a flat salary and, if specific sales goals were met, bonuses. In January 1995, Coffel received and signed a compensation package to govern the year, which included sales quotas to be achieved by his region ("January 1995 plan"). At that time, Stryker's Medical Division had two sales groups, one selling hospital beds and the other selling stretchers. Coffel and his territory managers were in the stretcher group.

Due to the Medical Division's economic losses in the first six months of 1995, Stryker hired both a new President for the Division, Brian Hutchison ("Hutchison"), and a new Vice President of Sales, David Johnston ("Johnston"). Under new management, a major reorganization of the Division resulted in a reduction in Stryker's sales force and the merger of the Medical Division's bed and stretcher groups. As a result, Coffel received an additional product line–beds.

As part of the restructuring, the company presented a new bonus plan to Coffel and the other regional managers for August 1995 through December 1995 (the time period from the merger to the end of the calendar year). The new bonus plan consisted of four parts: (1) the annual "percent to quota" bonus (the overall sales of a region compared to the quota set by management for that region),

_____

[1]Initially Stryker also contended on appeal that the district court erred in finding that Coffel made adequate presentment of his claim to support the award of attorneys' fees under Texas law; however, Stryker subsequently withdrew this challenge. Reply Brief of Appellee/Cross-Appellant Stryker Corporation at 9.

(2) the quarterly "balance sell" bonus (for selling across the various product lines), (3) the quarterly "discount" bonus (for limiting the amount of discounts given on sales), and (4) the annual "expense control" bonus (for reducing incidental expenses).

In August 1995, there were a series of meetings at Stryker regarding the setting of the quotas necessary to determine the compensation for the regional managers ("August meetings").[2] After the initial merger, Johnston met with his new group of regional managers, including Coffel, to discuss possibilities for a new compensation plan to replace the January 1995 plan. Johnston used an overhead screen and handouts to identify designated target categories and discuss bonus targets for regional managers. Coffel contends that Johnston told the regional managers: "Guys, this is a rich client. You could make a lot of money. . . . You could make $10,000 per category." At the conclusion of the meeting, Stryker claims that Johnston collected all copies of the draft plan and informed the regional managers that it was not complete but rather was a work in progress.

Coffel attended a subsequent meeting in August 1995 with Johnston and the other regional managers. At this meeting, the regional managers were informed that a new compensation plan would replace the January 1995 plan ("August Plan") and they discussed how quotas should be allocated to each of the newly-consolidated regions. Stryker claims that during this meeting, David Damm ("Damm"), the Medical Division's Director of Marketing, ran figures and statistics through a computer database and arrived at a preliminary quota of $3.3 million for Coffel's region.

According to Stryker, Johnston subsequently set Coffel's quota at $3.9 million. However, Coffel claims that subsequent to his acceptance of, performance under, and reliance upon Stryker's representations regarding the new contract, the company repudiated the plan by increasing his quota

---

[2]The timing, location, and topic of discussions at these meeting are in dispute.

from $3.3 million to $3.9 million. In late August 1995, Damm sent a memorandum to Coffel detailing the quotas for the August to December 1995 time period ("Damm memo"). Coffel claims that the $3.3 million quota figure was attached to the memo, while Stryker contends that the previously discussed $3.9 million quota that Johnston set was attached to it. In early October 1995, Coffel received his compensation plan in final written form in a memorandum from Johnston dated September 29, 1995 ("Johnston plan").

Coffel continued working as a regional sales manager through the end of 1995, and on January 5, 1996, he began working as a regional project manager for Stryker. Soon thereafter, he resigned. In a February 1996 letter to Stryker, he alleged that Stryker had discriminated against him.

Coffel sued Stryker, claiming age discrimination under the Age Discrimination in Employment Act, disability discrimination under the Americans with Disabilities Act, and workers' compensation discrimination under Texas law, TEX. LAB. CODE ANN. § 45.001 (Vernon 1997). Additionally, he claimed breach of contract, fraud, and negligent misrepresentation related to bonuses to which he claimed entitlement.

The case was tried before a jury from February 1, 1999 to February 8, 1999. The jury rejected Coffel's three discrimination claims, as well as the negligent misrepresentation claim. It returned a verdict for Coffel on the fraud and breach of contract claims, awarding Coffel $8,000 in actual damages on the contract claim, $93,900 in actual damages on the fraud claim, and $400,000 in exemplary damages.

On February 17, 1999, Stryker filed a motion to set aside the verdict and for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). Based on the partially favorable verdict, on March 4, 1999, Coffel filed a motion seeking an attorney fee award of $143,543.75 for fees

4

incurred at the trial level, plus an additional $7,500 for post-verdict fees, and $12,500 for services in the event of appeal. In an order dated June 23, 1999, Magistrate Judge Albright granted Stryker's Rule 50(b) motion on the fraud and associated damages findings, but denied the motion with respect to the contract claim. Thus, Coffel's recovery was limited to $8,000 for breach of contract damages. The magistrate judge entered final judgment on July 2, 1999; however, he subsequently noted the pendency of Coffel's motion for attorneys' fees and rescinded the judgment to address that issue. Before ruling on that motion, Magistrate Judge Albright left the federal bench to return to private practice, and the attorneys' fees motion was brought before Magistrate Judge Austin. Magistrate Judge Austin awarded Coffel attorneys' fees under Texas law, but reduced his requested amount from $151,043.75 to $26,837.50 for fees incurred at trial on the breach of contract claim, plus $6,250 in the event of a successful appeal. This appeal followed.

## DISCUSSION

I.      Rule 50(b) Motion and the Sufficiency of Evidence

      A.      Standard of Review

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." Flowers v. S. Reg'l Physician Servs., 247 F.3d 229, 235 (5th Cir. 2001) (internal quotations omitted) (quoting Ford v. Cimarron Ins. Co., Inc., 230 F.3d 828, 830 (5th Cir. 2000)). This Court reviews de novo the district court's ruling on a motion for judgment as a matter of law, applying the same legal standard used by the district court. Id. (citing Ford, 230 F.3d at 830; Brown v. Bryan County, Okla., 219 F.3d 450, 456 (5th Cir. 2000), cert. denied, 121 S. Ct. 1734 (2001)). "Although our review is de novo, . . . our standard of review with respect to a jury verdict is especially deferential." Flowers, 247 F.3d at 235 (internal quotations

5

omitted) (quoting <u>Brown</u>, 219 F.3d at 456). Therefore, judgment as a matter of law should only be granted if "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." <u>Id.</u> (internal quotations omitted) (quoting <u>Omnitech Int'l, Inc. v. Clorox Co.</u>, 11 F.3d 1316, 1322 (5th Cir. 1994)).

Under Rule 50, "judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." <u>Id.</u> (internal quotations omitted) (quoting <u>Ford</u>, 230 F.3d at 830). Moreover, in entertaining a Rule 50 motion, the court "must review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence." <u>Ellis v. Weasler Eng'g Inc.</u>, 258 F.3d 326, 337 (5th Cir. 2001) (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Id.</u> (internal quotations omitted) (quoting <u>Reeves</u>, 530 U.S. at 150-51 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986))). In reviewing the record as a whole, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Id.</u> (citing <u>Reeves</u>, 530 U.S. at 151 (citing 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529 (2d ed. 1994))). That is, the court "must give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." <u>Id.</u> (internal quotations omitted) (quoting <u>Reeves</u>, 530 U.S. at 151 (citing WRIGHT & MILLER, <u>supra</u>)).

Coffel suggests that although the district court set forth the appropriate Rule 50(b) standard, it failed to review the record as a whole and draw all reasonable inferences in his favor as the nonmovant. After reviewing Magistrate Judge Albright's order, we conclude that he reviewed all of the evidence in the record, not limiting his 50(b) review to the evidence specifically identified by Coffel as supporting the verdict on fraud.[3] We address in our de novo review of the sufficiency of the evidence of fraud and fraud-based damages Coffel's contention that the district court failed to indulge all reasonable inferences in his favor.

B.      Sufficiency of the Evidence of Fraud and Fraud-Based Damages

Coffel argues that the district court erred by granting judgment as a matter of law on the fraud claim and finding insufficient evidence to support fraud damages and punitive damages. We agree.

1.      Fraud Claim

Under Texas law, the elements of a fraud cause of action are: (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result. E.g., Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998). In the case of a promise of future performance, the plaintiff also has to prove that "the promise was made with no intention of performing at the time it was made." Id. at 48. At issue is whether Coffel established, as part of his

---

[3]Although the order frequent ly mentions the plaintiff's burden to present evidence of intent to defraud and reliance to sustain a cause of action for fraud, the district court did not improperly shift the burden to Coffel to marshal all of the evidence in the record to justify the jury verdict on fraud. The references to "plaintiff's evidence" merely pertain to Coffel's ultimate burden of proof on his fraud claim. As the district court summarized its 50(b) review, "the Court has *carefully reviewed the transcript from the trial* as well as the arguments made by counsel and is left with the opinion that there was no evidence of fraud to support the determination by the jury." (emphasis added).

7

*prima facie* case, that Stryker committed fraud when it changed its salary and bonus framework. Specifically, we decide whether there was legally sufficient evidence of the following points to support the jury's verdict and survive judgment as a matter of law: (1) a promise or representation, (2) fraudulent intent, and (3) Coffel's reliance.

Coffel alleges that Stryker made three representations that it never intended to keep in order to induce Coffel to continue employment after the merger under the new bonus compensation plan, and that Coffel relied on these representations in accepting the new plan in August. First, the August plan and Damm memo represented that Coffel would have a $3.3 million quota for August through December. Second, the August plan and the Johnston plan represented that Coffel could potentially earn a "discount" bonus. Third, the August plan and the Johnston plan represented that Coffel could potentially earn an "expense control" bonus.

Regarding a promise of future performance, the district court's order stated: "The Court finds that there is no evidence that the Defendant made a promise to do an act in the future." Coffel argues that this finding of no promise is in error[4] because Stryker must have made *some* representations of future acts, as evidenced by the jury's verdict on breach of contract and its survival of the motion for judgment as a matter of law. Stryker contends that the magistrate judge's conclusion that there was no promise of a $3.3 million sales quota was not in error, and that Coffel's argument begs the

---

[4]Coffel also contends that this "finding" may be a misstatement by the district court, considering that it is the introductory sentence of a paragraph discussing the element of fraudulent intent and the subsequent discussion of the absence of a present *intent* not to perform on the promise. While we are sympathetic to Coffel's point, we believe that the district court made this finding, albeit conclusory, and couched its subsequent analysis as "[g]iving the Plaintiff the benefit of the doubt that [promises] were made."

8

question.[5] Stryker presents a simple argument: Because the essence of Coffel's fraud claim is that he was fraudulently induced to remain in the employ of Stryker based on an alleged promise that Stryker would use a $3.3 million quota, as opposed to Stryker's actual use of a $3.9 million quota, Coffel's unequivocal admission on cross-examination that from the outset of the new bonus compensation plan, *he knew* that the higher $3.9 million quota applied, defeats his claim of fraud. To support its argument that Coffel knew that he had a $3.9 million quota from the inception of the new plan, Stryker relies on the following portion of Coffel's cross-examination:

Q:      Up until recent times you have understood all along that your quota was $3.9 million; isn't that right?

A:      Yes, I have a $3.9 million quota.

Q:      Your quota was $3.9 million from day one, wasn't it?

A:      Under duress, yes, sir.

Tr. Vol. 2, at 174. Stryker claims that Coffel's "admission" that he knew of his $3.9 million quota all along came after he clarified that he knew of his $3.9 million quota at the second August meeting, and was forced to admit that he distributed $3.9 million worth of quota to his own sales people on Labor Day weekend at the end of August 1995. Coffel responds that there was no such admission and that the testimony was not inconsistent.

After reviewing the entire record, and drawing all reasonable inferences in Coffel's favor, we determine that Stryker's "admission" argument fails. First, Coffel did not admit that he understood from the plan's inception that his quota was $3.9 million. Although reading the above testimony out

---

[5]As discussed *infra*, Stryker argues that because Coffel had a $3.9 million quota, and there was no promise of a $3.3 quota, there is no contract on terms other than a $3.9 million quota and the trial court erred by denying judgment as a matter of law on the breach of contract claim.

of context could lead one to that conclusion, after reading the testimony in context, its meaning is more ambiguous. Coffel testified, "I *have* a $3.9 million quota," and acknowledged that the $3.9 million quota governed the new plan covering August to December of 1995. This does not necessarily mean that he *knew* that his quota was $3.9 million when he began working under this new plan in August and at the August meetings. Although Johnston told Coffel in the second August meeting that his quota was not high enough, Coffel consistently testified that he received a memo dated August 30, 1995 from Damm with a $3.3 million quota. Tr. Vol. 1., at 682; Vol. 2, at 236, 239. By the end of August, Coffel knew that the $3.9 million quota was coming, and thus, prepared the quota for his staff on Labor Day weekend based on that number, as per Johnston's request. Tr. Vol. 2, at 174, 238. The first time he received the $3.9 million quota in writing, however, was the memo from Johnston dated September 29, 1995. Tr. Vol. 2, at 237, 241. Considering the evidence, a reasonable jury could have determined that Coffel's cross-examination testimony was consistent with his previous and subsequent testimony. It could then have concluded that although Coffel eventually knew that the $3.9 million figure would govern the new compensation plan, he originally believed that his quota was $3.3 million and did not learn that the quota was going to change until he began wo rking under the new plan. Second, by limiting the question of a promise of future performance to the $3.3 million quota, Stryker overlooks allegations that Stryker's new compensation plan included representations to Coffel of various bonus components that were never paid, only one of which included the $3.3 million quota.

We conclude that Coffel presented legally sufficient evidence that Stryker made promises of future performance. Coffel and other regional managers testified that they accepted a new compensation package in late July or early August of 1995 and that this package included a $3.3

10

million quota for Coffel and his Southwest Region. While Stryker flatly denies that the $3.3 million figure discussed in the August meetings was a "promise," and Damm testified that the $3.3 million was merely a preliminary quota, evidence was produced at trial that the $3.3 million quota was confirmed in the Damm memo on August 30, 1995. Johnston even acknowledged that, prior to September 29, the quota established for Coffel "appears" to be $3.3 million. Accordingly, there is sufficient evidence that the $3.3 million quota representation was in fact made by Stryker. Further, the August plan, as well as the Johnston plan, included representations that the new compensation plan contained "discount" bonus and "expense control" bonus components. Viewing all reasonable inferences in Coffel's favor, the jury could have reasonably concluded that these three representations were promises of future performance.

The district court also ruled that, even assuming a representation or promise was made, Coffel did not introduce any evidence, direct or circumstantial, of Stryker's intent not to perform.[6] A promise to do an act in the future is actionable fraud if representations are made with the "intent to deceive and with no intention of performing as represented." Formosa, 960 S.W.2d at 48. "Moreover, the evidence presented must be relevant to [the defendant's] intent at the time the representation was made." Id. "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given their testimony." Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986). Since intent to

---

[6]The district court found that "there is no direct evidence that the [representations] were made with the intention that they would deceive." Further, the court concluded that there was no evidence, circumstantial or direct, that Stryker "amended its quota plan with the *intent* that it would not meet it."

11

defraud is generally not susceptible to direct proof, it usually must be proven by circumstantial evidence. Id.

"While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." Spoljaric, 708 S.W.2d at 434. A denial that a promise was made and a failure to perform are factors showing no intent to perform when the promise was made; however, standing alone, these do not suffice. Ensley v. Cody Res., Inc., 171 F.3d 315, 322 (5th Cir. 1999) (citing T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 222 (Tex. 1992); Spoljaric, 708 S.W.2d at 435). There must be some additional "slight circumstantial evidence" of fraud to support a finding of fraudulent intent. Id. (citing Spoljaric, 708 S.W.2d at 435; Hoechst Celanese Corp. v. Arthur Bros., Inc., 822 S.W.2d 917, 925 (Tex. App. 1994)). "No pretense of performance by the defendant has also been held to be a factor showing lack of intent." Spoljaric, 708 S.W.2d at 435 (citing Chicago, T.&M.C. Ry. Co. v. Titterington, 19 S.W. 472, 474 (Tex. 1892)).

Coffel asserts that the record contains both direct and additional circumstantial evidence sufficient to survive judgment as a matter of law. Coffel points to a report prepared by Hutchinson prior to the August meetings and argues that the report's recommendations were inconsistent with the August plan and therefore the report constituted direct evidence of Stryker's present intent not to perform under Formosa.[7] We agree. In the August meetings, Johnston, Hutchinson's direct subordinate and Vice President of the Medical Division, made representations to the regional

---

[7]In Formosa, the defendant made representations to the plaintiff in a bid package and a contract that the plaintiff would have control of the delivery of the concrete necessary for the construction project. 960 S.W.2d at 48. In contravention of this representation, the defendant decided, two weeks before the contract was signed, to take over delivery of the concrete without informing the contractor. Id.

12

managers, including a $3.3 million quota for Coffel and the "discount" and "expense control" bonuses, and stated that the new plan was "a chance to make some big money." Coffel and the other regional sales managers viewed this plan as an opportunity for a substantial increase in their compensation. In contravention of these representations, Hutchinson had already prepared a report, in June 1995, advising Stryker's CEO John Brown that, among other problems which needed correction, Stryker's "selling costs [were] very high," the commission program for the sales staff was "very rich," and that "[t]his area [had] lots of savings opportunity." Hutchinson's report also recommended combining the Medical Division's bed and stretcher groups into one sales group. Brown testified that he agreed that there should be a change in management and, in fact, hired Hutchinson as President of Stryker's Medical Division to lead the reorganization and implement the recommendations contained in his report. One of the first steps taken by Hutchinson was to "merge" the bed and stretcher groups. In August of 1995, a new compensation plan was developed for the Medical Division's regional managers. Johnston testified that the new plan was designed to give the sales managers incentive and motivate them to work on the merger and help with training, because the merger would have failed without the efforts of Stryker's sales managers. Stryker's Human Resources Director, at the time of the merger, testified that the compensation plan was designed to encourage the managers to sell across the merged product lines. We conclude that a jury could have found that Coffel presented legally sufficient evidence that Stryker discussed quotas and bonuses in the August meetings with intent to deceive and no intention of performing as represented in order to induce Coffel to enter into a new compensation plan and assist with the merger.

In addition to this direct evidence, Coffel also points to the subsequent acts of Stryker as evidence of its lack of intent to perform under the discussed quota and bonuses in the August

13

meetings at the time these representations were made. Stryker adamantly denies that it ever made any promise to Coffel based upon a $3.3 million quota, and instead set Coffel's quota at $3.9 million. Coffel relies on the additional evidence that Stryker (1) immediately repudiated the $3.3 million quota, (2) delayed in distributing the final written compensation plan until October 1995, (3) changed other terms of the compensation plan between August and the October Johnston plan, (4) took credits against Coffel's quota, and (5) failed to pay any of the regional managers the full bonus under the August plan. Johnston's immediate repudiation of the $3.3 million quota, saying "Coffel's quota wasn't high enough" and that the Southwest was "a senior veteran region [and] could handle more," is consistent with Stryker's lack of intent to keep its promises under the August compensation plan. Cf. Beijing Metals & Minerals Import/Export Corp. v. Am. Bus. Ctr., Inc., 993 F.2d 1178, 1186 (5th Cir. 1993) (concluding that under Texas law, immediate repudiation of a promise was a factor precluding summary judgment on plaintiff's fraud claim). Coffel agreed to a new plan in August 1995 that was to cover his compensation through December, but no formal written plan was distributed for almost two months. The jury could have inferred that this delay was evidence of fraudulent intent. Cf. Spoljaric, 708 S.W.2d at 435 (holding that the jury's finding of fraudulent intent was supported by evidence of an eight month delay in producing a previously agreed upon bonus plan). Further, various terms of the new plan changed between August and the Johnston plan; specifically, requirements for making the "balance sell" bonus increased, the total compensation possible under the bonus plan was lowered, and a disclaimer was added that Stryker had sole discretion regarding changes to the plan. Stryker also took "credits" for sales occurring prior to August 1995 against Coffel's quota in December, after representing in August that no such credits would be taken. Lastly, Coffel claims that the highest bonus Stryker paid to a regional manager was $13,900, despite

14

representations that there was a potential of earning $60,000.[8] Considering all of the circumstantial evidence of Stryker's lack of intent in conjunction with Stryker's denial of the $3.3 million quota and failure to keep its promise, we hold that there was sufficient evidence to support the jury's finding of fraudulent intent.

Further, Coffel argues that Stryker's failure to distribute or maintain information necessary for the computation of two of the four categories of the August and Johnston plans shows a lack of pretense of performance, from which fraudulent intent can be inferred. Regarding the "expense control" bonus, for keeping expenses under budget, Stryker failed to distribute expense budgets to its regional managers, and thus, they were unable to compare their expenses to their budgets in order to qualify and there was no data available for Coffel to calculate whether he met this component of the plan. Further, evidence at trial indicated that Stryker consistently denied that it maintained the information necessary to compute the "discount" bonus element of both compensation plans at the time the bonuses were to be paid At trial, however, a Stryker employee, Bill Kleczynski ("Kleczynski") testified that this data was maintained, that the bonus was calculated, and that Coffel did not qualify for a discount bonus. We hold that, considering the above evidence, a jury could have reasonably concluded that Stryker never intended to implement the "discount" and "expense control" components of its bonus plan.

After concluding that the trial court erred in finding no evidence that Stryker never intended to perform, we must determine whether the record provides legally sufficient evidence of Coffel's reliance upon any of Stryker's representations. In order to prove reliance, the party claiming fraud

---

[8]Coffel points to Exhibit D-113 for the $13,900 figure; however, that exhibit implies that $12,600 was the highest quota. Either way, both figures are substantially less than $60,000.

15

must show actual and justifiable reliance on the defendant's representations. Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1025 (5th Cir. 1990); Morgan v. Amarillo Nat'l Bank, 699 S.W.2d 930, 937 (Tex. App. 1985). Thus, fraud does not exist unless the defendant's representations induced the plaintiff to take a particular course of action. Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 930 (Tex. 1996); Morgan, 699 S.W.2d at 937. It is not necessary that the representations were the sole inducement, but the representations relied upon must have been a material factor in inducing the plaintiff's action. First State Bank v. Olde Colony House, 414 S.W.2d 221, 223-24 (Tex. App. 1995).

Coffel argues that the district court erred in finding that he failed to put forth any evidence of reliance, contending that he relied on Stryker's representations by (1) remaining in Stryker's employ, (2) foregoing compensation to which he was due under the prior January 1995 compensation plan, (3) delaying consideration of other job opportunities, and (4) accepting more duties. The district court stated that "[t]he only possible conduct that Plaintiff could have made in reliance on any statement made at the August meeting is that he gave up the bonus plan that he had begun the 1995 year with in exchange for the new bonus plan." The court then rejected this as credible evidence of reliance because "there is no evidence of any alternative that the Plaintiff considered to staying in the employ of Striker." We disagree with the district court's reasoning[9] and conclude that Coffel's decision to forego pursuing compensation earned under the January 1995 compensation plan and

---

[9]While an employee-at-will's decision to turn down other employment in reliance on an employer's representations may constitute evidence of the reliance element of a fraud claim, other actions taken by such an employee may be sufficient to constitute reliance. Cf. Johnson & Johnson, 924 S.W.2d at 930.

continue employment with Stryker under the new compensation plan based upon the representations made to him in August 1995 constituted actual and justifiable reliance.[10]

Under the January 1995 contract, some bonus components were computed and paid quarterly, while other components were computed annually. Under this plan, Coffel met his quota and received his bonus for the first and second quarters, and he was ahead of pace to meet his quota for the third quarter at the end of July. Further, by the end of the second quarter, Coffel testified that he was very close to meeting the overall quota for his region and that he believed he would have made his year-end bonus. Stryker told its regional managers in August 1995, half way through the third quarter, that the new compensation plan would cover from August through December. Stryker also told Coffel that he would not be paid under the January 1995 contract for July "[b]ecause the numbers were so badly confused it would be almost impossible to extract your numbers." Coffel testified at trial that based upon his experience in previous years, he gave up something of value from his January 1995 contract in accepting the new compensation plan. A jury could have reasonably concluded that Coffel relied upon Stryker's representations in August, including the $3.3 million quota figure and the "discount" and "expense control" bonus components, in concluding that the new plan would adequately compensate him for July and his expected bonuses under the January 1995 plan and in giving up that plan in exchange for what Stryker represented as the new bonus plan. Further, Coffel presented evidence that this reliance was justified because Stryker's past practice was that quotas never changed after performance had begun and the President of Stryker's Medical Division testified that it was fair for the regional managers to rely upon representations in connection with the bonus

---

[10]We need not consider whether Coffel presented any other evidence of reliance.

plan. Thus, we find that the district court failed to draw all reasonable inferences in Coffel's favor and conclude that the record presents legally sufficient evidence to support the jury's fraud finding.

### 2. Fraud Damages

To recover for fraud, the plaintiff must plead and prove that a pecuniary loss was suffered as a result of reliance upon a false representation. DiGrazia v. Atlantic Mut. Ins. Co., 944 S.W.2d 731, 735 (Tex. App. 1997). The measure of damages is the actual amount of the plaintiff's loss resulting directly and proximately from fraud. Id. Texas law recognizes the out-of-pocket and the benefit-of-the-bargain measures of direct damages for common law fraud. Formosa, 960 S.W.2d at 49. "The out-of-pocket measure computes the difference between the value paid and the value received." Id. The out-of-pocket measure compensates for the actual injury sustained, "measured by the difference between the value of that which he has *parted with*, and the value of that which has been received." Id. (citations and internal quotations omitted). "[T]he benefit-of-the-bargain measure computes the difference between the value as represented and the value received." Id. The benefit-of-the-bargain method can include lost profits on the bargain if such damages are proved with reasonable certainty, but this measure only compensates for the profits that the plaintiff would have made if the bargain had been performed as promised. Id. (citing RESTATEMENT (SECOND) OF TORTS § 549(2) (1997)).

The district court concluded that there was no legally sufficient evidence supporting an award of damages for fraud. The court reasoned, and Stryker argues on appeal, that Coffel's loss of either salary or bonuses was not reasonably certain because the testimony was mere speculation; thus, there was not legally sufficient evidence of benefit-of-the-bargain damages to support the jury's award of

18

$93,900.[11] In concluding that Coffel's losses were not reasonably certain, the district court cited Texas case law denying recovery of lost profit damages where they were not proved with reasonable certainty.[12] Thus, the court concluded that, as with lost profits, Coffel must prove his lost bonuses to the same degree of reasonable certainty.

Although "recovery for lost profits does not require that the loss be susceptible of exact calculation," the plaintiff must do more than demonstrate that some lost profits were suffered. Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992). "[W]hether lost profits have been proved with reasonable certainty is a fact-intensive determination dependent upon the circumstances of a particular case." Formosa, 960 S.W.2d at 50 n.3. "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." Heine, 835 S.W.2d at 84. "When a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award." Formosa, 960 S.W.2d at 50 n.3.

Coffel contends that the trial court erred in finding that the evidence was insufficient to support *any* award of fraud damages, without evaluating any of the evidence related to damages. Coffel also argues that he has established damages under the benefit-of-the-bargain measure because he proved his lost bonuses to a reasonable certainty. We agree.[13] Coffel was required to prove his

---

[11]The court mentioned, but did not address whether Coffel established out-of-pocket damages–i.e., damages suffered as a result of giving up the January 1995 plan in exchange for the new plan.

[12]See Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994); Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992).

[13]Because the district court determined that there was legally insufficient evidence that Coffel suffered pecuniary losses, the court did not address whether there was sufficient evidence to establish the amount of any such losses or whether the jury's award of $93,900 was excessive. Further,

19

lost bonuses to a reasonable certainty under the benefit-of-the-bargain measure. See RESTATEMENT

(SECOND) OF TORTS § 549(2) (1997) ("[T]he recipient of a fraudulent misrepresentation in a business

transaction is also entitled to recover additional damages sufficient to give him the benefit of his

contract with the maker, if these damages are pro ved with reasonable certainty."). Although the

district court properly recognized that reasonable certainty was the proof requirement, the court

improperly equated Coffel's lost bonuses with lost profits, which are speculative by their very

nature.[14]

We conclude that Coffel's lost bonuses were not too speculative. Instead, Coffel provided

evidence of what Stryker's fraudulent representations were, what Coffel's actual performance was

during the last five months of 1995, and what Coffel's bonus payment was for that period. The total

potential bonus under the August 1995 plan was $110,000[15] and Coffel received a total of $9,100.

Although Coffel did not keep his own performance numbers because he did not expect Stryker to

commit fraud and Stryker's documents include inconsistent data of Coffel's performance, Coffel

presented at least the "minimum" objective evidence to establish lost bonuses with reasonable

---

Stryker does not contend that the damages awarded are excessive on appeal. Therefore, we do not address this issue.

[14]Pace Corp. v. Jackson, 284 S.W.2d 340, 348 (Tex. 1955) ("The damages awarded respondent were, in large measure, speculative, but the same could be said of any recovery of lost profits. . . . In their nature, profits are more or less conjectural or speculative . . . ."). The Texas Supreme Court has recognized, however, that even the heightened "reasonable certainty" requirement for proof of lost profits "is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." Texas Instruments, 877 S.W.2d at 279.

[15]This includes a "percent to quota" bonus with a $20,000 potential; a "balance sell" bonus with a $60,000 potential; a "discount" bonus with a $16,000 potential; and an "expense control" bonus with a $14,000 potential.

20

certainty.[16] The jury could have considered the objective data of Coffel's performance and reasonably determined that Coffel was entitled to $93,900 for lost bonuses under the fraudulent August representations. We find legally sufficient evidence to support the award of fraud damages.

### 3. Punitive Damages

The district court held that Coffel was not entitled to the award of $400,000 in punitive damages because Coffel failed to prove fraud and, alternatively, because there was insufficient evidence of malice or intent to harm. Because we found that judgment as a matter of law as to fraud was inappropriate, we address the district court's latter reasoning. The district court based its conclusion on its review of employment cases from Alabama, Idaho, Ohio, and New Jersey suggesting that punitive damages are typically limited to cases where there is evidence of malice or its equivalent. While the district court recognized that Spoljaric held that "conscious indifference" supports a punitive damages award, 708 S.W.2d at 435, the court concluded that the facts of this case were not identical to the Texas Supreme Court's decision in Spoljaric. We disagree and conclude that there is sufficient evidence to support the jury award of punitive damages.

"A finding of intent to harm or conscious indifference to the rights of others will support an award of exemplary damages." Spoljaric, 708 S.W.2d at 435 (citing Trenholm v. Ratcliff, 646 S.W.2d 927, 933 (Tex. 1983)). In Trenholm, the Supreme Court of Texas held that evidence that the defendant made several false representations to induce the plaintiff to buy lots and subdivisions

---

[16]Coffel's original demand letter requested $58,370 for a lost bonus, including a $50,000 "balance sell" bonus and a $8,370 "percent to quota bonus," but did not include a request for payment for the "discount" and "expense control" bonuses because Stryker did not provide him with accurate statistics. There was evidence at trial that Stryker never maintained the data necessary to compute these two bonus categories. Coffel also presented testimony that he should have received a $11,100 "percent to quota" bonus for the fourth quarter. Further, Coffel testified that the credits taken against his sales in December would have affected his bonus.

21

was sufficient to establish a conscious indifference warranting an award of $250,000 in punitive damages. 646 S.W.2d at 933. In Spoljaric, the Texas Supreme Court extended its holding to fraudulent misrepresentations in the employment context, holding that evidence that an employer fraudulently promised employees a bonus in order to retain their services was sufficient to support an award of exemplary damages. 708 S.W.2d at 435. Our holding that there is legally sufficient evidence to support a jury finding of Stryker's fraudulent intent to induce Coffel by false representations made with intent to deceive and no intention of performing constitutes sufficient evidence of conscious indifference to support the $400,000 award of punitive damages.

C.     Sufficiency of the Evidence of Breach of Contract

On cross-appeal, Stryker argues that the district court erred in denying judgment as a matter of law on Coffel's contract claim.[17] First, Stryker asserts that it did not breach the new compensation plan by raising the quota from $3.3 to $3.9 million because Coffel admitted on cross-examination that there was no contract on terms other than a $3.9 million quota. Second, Stryker claims that it did not commit a breach in failing to pay Coffel the "discount" and "expense control" bonuses because Coffel did not establish his entitlement to those bonuses. Third, Stryker contends that there is insufficient evidence that it breached the contract by charging old credits from returns against Coffel's 1995 sales because Coffel failed to introduce evidence that they had any effect on the bonus he received. We disagree and conclude that the record contains sufficient evidence supporting the jury's finding of breach of contract.

---

[17]Under Texas law, a binding contract requires "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." Copeland v. Alsobrook, 3 S.W.3d 598, 604 (Tex. App. 1999).

We agree with the district court's conclusion that Stryker is merely arguing that "its evidence contradicted that of [Coffel's]" and the jury was free to disbelieve the testimony of one witness regarding the terms of the employment agreement over the testimony of others. Stryker correctly recognizes that in reviewing a judgment as a matter of law, we will not weigh the evidence. Ellis, 258 F.3d at 337. In light of our holding that Stryker's "admission" argument did not defeat the jury's fraud verdict, we find that the argument similarly fails to defeat the jury's breach of contract finding. Further, the jury was free to disregard Kleczynski's testimony that Coffel was not paid because he did not meet his "discount" goal and conclude that Stryker breached the employment contract by failing to keep the information necessary to compile and compute the "discount" and "expense control" bonuses. The district court did not err in denying judgment as a matter of law and we need not address whether there was any additional evidence supporting the breach of contract.

II.     Coffel's Request for Attorneys' Fees

While we review fact findings in determining the reasonableness of an attorney fee award for clear error, "the ultimate award of fees is reviewed for abuse of discretion, as are determinations regarding hours and rates." Mid-Continent Casualty Co. v. Chevron Pipe Line Co., 205 F.3d 222, 232 (5th Cir. 2000) (internal quotations omitted) (quoting Cobb v. Miller, 818 F.2d 1227, 1231 (5th Cir. 1987)).

Texas law authorizes the award of "reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 1997). The award of reasonable attorneys' fees is mandatory under § 38.001 if the plaintiff prevails in his or her breach of contract claim and recovers damages. Kona Tech. Corp. v. S. Pac. Transp. Co., 225 F.3d 595, 603,

23

613 (5th Cir. 2000) (citations omitted). The trial court has the discretion to determine the appropriate amount of attorneys' fees following a successful claim under § 38.001. Id. at 613 (citations omitted).

Coffel argues that Magistrate Judge Austin abused his discretion in determining that the requested fees were not reasonable and in reducing the fees requested by over seventy-five percent. Coffel sought an award of $151,043.75 for fees incurred at the trial level, plus an additional $12,500 for services in the event of appeal. The district court ultimately awarded Coffel $26,837.50 in fees on the breach of contract claim along with $6,250 in the event of appeal. In reducing the requested fee award, the district court noted that the requested fees "were based on a jury's award of nearly $500,000 in damages on both fraud and a contract theory" and that following judgment as a matter of law on the fraud claim, Coffel ultimately recovered only $8,000 on the breach of contract claim. The court properly noted that, while not the determinative factor, one factor in assessing the reasonableness of attorneys' fees is the amount recovered. E.g., Wayland v. City of Arlington, 711 S.W.2d 232, 233 (Tex. 1986) (per curiam); Panzio v. YMCA, 938 S.W.2d 163, 169 (Tex. App. 1996). Magistrate Judge Albright also observed that Coffel sought $40,000 on his breach of contract claim and ultimately recovered only $8,000.

Coffel argues that because the proof of fraud and breach of contract were inextricably intertwined, the court erred in segregating the attorneys' fees incurred so as to identify those fees that were reasonably expended on the breach of contract claim. We note that the district court did give Coffel credit for twenty percent of the entries inextricably related to the contract claim. The court also reduced some of the entries where it determined the time spent was excessive before applying the twenty-percent factor.

24

We do not find that the district court's determination of the amount of the attorneys' fees award was an abuse of discretion, in light of its findings, but we conclude that our reversal of the district court's judgment as a matter of law on the fraud verdict warrants remand to the district court for reconsideration of Coffel's request for attorneys' fees. On remand, the fee request will be based on the award of over $500,000 in damages on both a fraud and contract theory. Further, the court may want to reconsider its segregation of attorneys' fees to identify those fees reasonably expended in pursuit of the breach of contract claim in light of Texas case law permitting an award of attorneys fees for a fraud claim when it is so interrelated to the successful contract claim that the prosecution of the claims requires proof of the same facts. See Stewart Title Guaranty Co. v. Aiello, 941 S.W.2d 68, 73 (Tex. 1997); Bates v. Tex. State Technical Coll., 983 S.W.2d 821, 831 (Tex. App. 1998); Schindler v. Austwell Farmers Coop., 829 S.W.2d 283, 288 (Tex. App. 1992); Gill Sav. Ass'n v. Chair King, Inc., 783 S.W.2d 674, 680 (Tex. App. 1989). In addition to awarding appropriate attorneys' fees incurred at the trial level, the court should enter an award for services rendered on this successful appeal.

## CONCLUSION

We REVERSE the district court's grant of judgment as a matter of law on the fraud claim and the compensatory and exemplary damages. We AFFIRM the district court's denial of judgment as a matter of law on the contract claim. We REMAND Coffel's request for attorneys' fees for reconsideration in light of this opinion.

25