United States Court of Appeals
Fifth Circuit

**F I L E D**

April 20, 2006

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

05-41016
Summary Calendar

_____

JOEL R. CRISALLI,

Plaintiff - Counter-Defendant - Appellee,

versus

ARX HOLDING CORP.,

Defendant,

AMERICAN STRATEGIC INSURANCE CORP.,

Defendant - Counter-Claimant - Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
04-CV-111

_____

Before BARKSDALE, STEWART and CLEMENT, Circuit Judges.

CARL E. STEWART, Circuit Judge:[*]

Defendant-Appellants ARX Holding Corporation and American Strategic Insurance

Corporation ("ASI") appeal the district court's judgment for Plaintiff-Appellee Joel Crisalli

("Crisalli") in this contract dispute. ASI appeals seeking that this court reverse the district court and

_____

[*]Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not
precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

determine that the term "operation" as used in the parties' contract was not legally ambiguous. ASI also asserts that the district court erred in its damage findings and award of attorney's fees. For the following reasons, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In August of 1999, John Auer ("Auer"), President of ASI, contacted Crisalli to discuss the potential of him serving as a consultant to assist in the research and planning of a new Texas Lloyds Insurance Company ("ASI Lloyds"). The record reflects that after Auer initially contacted Crisalli, the parties met over lunch to discuss the details of Auer's proposal. At that time, Auer offered a compensation term for Crisalli of "(i) a $20,000 flat fee, plus (ii) additional compensation equal to 1%[1] of the gross written premiums for the first 24 months of operation." The parties agree that Crisalli accepted the terms proposed by Auer "then and there" at the lunch meeting. Thereafter, both parties agree that they confirmed the terms of the consulting agreement through an email exchange[2] initiated by Crisalli on August 23, 1999; however, the parties do not agree as to whether the oral luncheon agreement or the subsequent email agreement typed by Crisalli stood as the actual agreement between the parties, though the two agreements are identical. The interpretation of this agreement is at issue in this appeal.

Nonetheless, the essence of the agreement was subsequently fully performed by Crisalli and partially performed by ASI, as it paid Crisalli the $20,000 flat fee, with the understanding that Crisalli

---

[1]The 1% override is a mathematical function of the revenue ASI derived over the two years following the commencement of operations.

[2]The email from Crisalli reads as follows: "Consulting fee of $20,000 for the above listed items. Additional compensation equal to 1% of gross written premiums for the first 24 months of operation." Thus, its terms reiterated the terms agreed upon during the parties' lunch meeting.

would begin his work in October 1999 and complete it in December 1999, approximately six weeks later. On January 7, 2000, however, Auer sent Crisalli an email stating that because of unexpected delays he intended that April 1, 2000, be considered the date of commencement of operation instead of December 1999. Crisalli did not respond to the email; ASI therefore took the position that April 1, 2000, was the most reasonable determination for the date that operations began. In the alternative, at trial, ASI proposed October 18, 2000, as the date operations commenced; this was the date the Texas Department of Insurance issued a Certificate of Authority to ASI Lloyds. Crisalli contended, however, that ASI Lloyds did not "commence operations" until it sold its first policy on October 15, 2001.

Throughout the trial, Crisalli argued that he intended the 1% override to begin on the date the first policy was written. Auer, however, testified that ASI would not have entered into such an open-ended agreement because it would not provide an incentive for Crisalli to work as efficiently as possible in order to complete the start-up process for ASI Lloyds. Thus, ASI contends that its initial intention regarding the 1% override, was that the time period would begin as soon as Crisalli completed his initial work in December of 1999.

During a bench trial, the district court reviewed the language of the agreement and initially determined that the term "operation" did not have a definite meaning; therefore, the trial court found that the term "operation" was ambiguous and stated that the parties did not agree upon the 24-month period for which "gross written premiums" (the 1% override) would be measured. Thereafter, the court, relying on expert opinion, concluded that in accordance with the custom and usage of that term in the insurance industry, "operation" had only one reasonable meaning in the context of a consulting

3

engagement–"the ordinary meaning of that term is the state of being functional or operative, and that an insurance company is functional or operative when it is in a position to write insurance."

Based on this definition, the district court calculated the override amount due assuming ASI Lloyds began operations on August 24, 2001, as that is the date that ASI Lloyds appointed a duly licensed insurance agent to sell its policies. The district court explained,

> The agreement was the first 24 months of operation. And I think that covers the time period when the first agent is appointed and charged with the responsibility to go out and sell insurance. It may take a month, it may take two months, I don't know. In this case, it didn't take long, maybe a couple of months.

The court also considered the testimony and opinions of expert and fact witnesses who all opined that insurance operations are associated with the actual legal and/or practical ability to write insurance policies. Therefore, the court determined that the override would have been $313,584, though the record reflects that the attorney for ASI stated to the judge that the amount was "close" but was a "little high." Nonetheless, that amount was entered into the judgment, as were attorney's fees of $125,433.[3]

## II. DISCUSSION

*A. Contract Interpretation*

When exercising diversity jurisdiction over a question based upon state law, federal courts should apply the substantive law of that state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 72 (1938). Contract law is an area of state law. *Doctor's Ass., Inc. v. Casarotto*, 517 U.S. 681, 686 (1996)

---

[3]This amount was derived from a 40% contingency fee as provided by the Texas Practice and Remedies Code § 38.001 (2006). The court also included a conditional award of attorney's fees to Crisalli following a successful defense of this appeal and awarded him pre and post judgment interest.

("States may regulate contracts . . . under general contract law principles."). In Texas, whether a contract is ambiguous is a question of law for the court to decide. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). In construing contracts, we must ascertain and give effect to the parties' intentions as expressed in the document. *Id.* In order to do so, we review questions of law de novo. *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000).

It is well established that the terms of an oral contract must be clear, certain and definite. *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. Ct. App. 1992). "A lack of definiteness in an agreement may concern the time of performance, the price to be paid, the work to be done, the service to be rendered or the property to be transferred." *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. Ct. App. 1989). "A contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). A contract will fail for indefiniteness if the parties do not agree on its material terms. *Id.* If an alleged agreement is so indefinite as to make it impossible for a court to "fix" the legal obligations and liabilities of the parties, a court will not find an enforceable contract. *Engelman Irrigation Dist. v. Shields Bros.*, 960 S.W.2d 343, 352 (Tex. Ct. App. 1997). To be legally binding, "[t]he parties must have a meeting of the minds, and each must communicate his consent to the terms of the agreement." *Smith v. Renz*, 840 S.W.2d 702, 704 (Tex. Ct. App. 1992).

Courts usually look at the four corners of the contract and interpret that language by its plain, grammatical meaning unless doing so would contravene the intentions of the parties. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). A contract is only legally ambiguous when its meaning is unascertainable or it is reasonably susceptible to more than one meaning. *Employers Reinsurance*

*Corp. v. Threlkeld & Co. Ins. Agency*, 152 S.W.3d 595, 599 (Tex. Ct. App. 2003). "The ambiguity must become apparent when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.* 907 S.W.2d 517, 521 (Tex. 1995). A term is not ambiguous, however, merely because parties to an agreement have different interpretations of a term. *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W. 3d 96, 100 (Tex. 1999). In fact, a court may conclude that a contract is ambiguous even if the parties do not plead ambiguity. *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1995). Therefore, it is up to us to evaluate the agreement and subsequently the facts extrinsic to the agreement if necessary.

ASI asks us to find that because Crisalli drafted the email and because Texas uses the rule of construction requiring contractual ambiguities to be construed against the drafter, the district court erred in failing to enforce the reasonable construction proposed by the non-drafting party, ASI. Further, ASI explains that because Crisalli has been an insurance company executive for approximately thirty-five years, he is aware of the need for using precise language when preparing a business agreement. More specifically, it argued that, "[i]f he wanted the term 'operation' to mean the sale of the first policy he was quite capable of writing that language in the email." Even though ASI's argument is supported by some evidence showing that there was a meeting of the minds between ASI and Crisalli, we nonetheless believe the district court was correct.

The district court did not err in looking to extrinsic custom and usage evidence in this situation as an aid in its quest to determine if the misunderstanding between the parties amounted to a legal ambiguity. Contrary to ASI's contention, the record reflects that Crisalli's subsequent email merely confirmed the initial oral agreement between the parties. In other words, because Crisalli was

6

not the initial drafter, the district court was correct in determining that the contract should not be construed against him. ASI, through Auer, proposed the terms of the contractual agreement to Crisalli over lunch and the parties agreed to enter into a binding contractual agreement at that time. Moreover, the record reflects that Auer responded to Crisalli's email two days later by referring to Crisalli's email as an "outline" and stating, "[y]our *summary* sounds good." Therefore, we agree with the district court's determination that the email is a written memoranda that merely provided a synopsis of the oral agreement's terms.

Additionally, the fact that the initial agreement was oral does not cause the subsequent email outline of that agreement to become the binding contract between the parties. Courts in Texas will consider oral agreements; the "parol evidence rule does not preclude enforcement of prior or contemporaneous oral agreements that are collateral to an integrated agreement and are not inconsistent with, and do not vary or contradict, the express or implied terms or obligations thereof." *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 15-16 (Tex. Ct. App. 2005). Additionally,

> [a]n oral agreement is not superseded or invalidated by a subsequent or contemporaneous integration, not a written agreement by a subsequent integration relating to the same subject-matter, if the agreement is not inconsistent with the integrated contract, and (a) is made for separate consideration, or (b) is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract.

*Id*. (citing *William P. Terrell, Inc. v. Miller*, 697 S.W.2d 454, 457-58 (Tex. Ct. App. 1985)). In order to interpret oral agreements, extrinsic evidence may be used to define commonly understood meanings of terms within a particular vocation. *CBI Indus., Inc*., 907 S.W.2d at 521 n.6 (citing Restatement (2d) of Contracts § 222 (1981)). Furthermore, it is common for a specialized industry

or trade term to require extrinsic evidence to shed light on the commonly understood meaning of a term within a particular industry. *See id*.

Accordingly, extrinsic evidence in this case, gathered through the testimony of experts during trial, enabled the district court to determine that "operation" as it relates to the insurance industry means "state of being functional or operative, and that an insurance company is functional or operative when it is in a position to write insurance." This evidence clearly demonstrates that the term "operation" would not void the agreement between ASI and Crisalli as ambiguous. Therefore, we affirm the holding of the district court, determining that the date of "operation" was August 24, 2001, when ASI Lloyds became "fully functional" in the state of Texas.

*B. Damages and Attorney's Fees*

The amount of damages awarded for a breach of contract is a question of fact which, in a bench trial, is reviewed for clear error. *See Kona Tech. Corp.*, 225 F.3d at 601. The amount of attorney's fees that should be awarded to the prevailing party is also a question of fact, but should be reviewed to determine if the trial judge abused his discretion. *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 (5th Cir. 2000). Texas law authorizes the award of "reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8) (2006). The award of reasonable attorney's fees is mandatory under section 38.001 if the plaintiff prevails in his or her breach of contract claim and recovers damages. *Kona Tech. Corp.*, 225 F.3d at 603, 613. The trial court has the discretion to determine the appropriate amount of attorney's fees following a successful claim under section 38.001. *Coffel*, 284 F.3d at 640-41.

8

ASI argues that because the district court should have used the April 1, 2000, date as the appropriate date for the purposes of defining "operation", it should have awarded Crisalli only $1,481.90 for damages and $592.76 for attorney's fees. Furthermore, ASI states that "even using the October 18, 2000 date as the basis for the damage calculation Crisalli should have only been awarded $36,392.77." ASI, however, merely makes the assertion; it does not explain how it calculated this amount. That notwithstanding, because we have determined that the district court used the correct date in defining "operation" under the oral contract, we also determine that the district court did not commit clear error in awarding damages of $313,584 and did not abuse its discretion in awarding attorney's fees of $125,433 to Crisalli.

## III. CONCLUSION

For the foregoing reasons we AFFIRM.

9