United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 17, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-11148
_____


AMERICAN REALTY TRUST INC; BASIC CAPITAL MANAGEMENT INC

Plaintiffs - Counter Defendants - Appellants

v.

MATISSE CAPITAL PARTNERS LLC; ET AL

Defendants - Counter Claimants

MATISSE CAPITAL PARTNERS LLC; PAUL BAGLEY

Defendants - Counter Claimants - Appellees

_____

Appeal from the United States District Court
for the Northern District of Texas
No. 3:00-CV-1810-G
_____

Before KING, Chief Judge, and DAVIS and EMILIO M. GARZA, Circuit
Judges.

KING, Chief Judge:[*]

Two corporations brought breach of contract and breach of

fiduciary duty claims against their former financial consultants,

and the defendant consultants countersued for breach of contract.

The jury returned verdicts in the plaintiffs' favor on all

---

[*]    Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

relevant counts.  On the defendants' renewed motion for judgment as a matter of law, the district court set aside the verdicts and entered judgment in the defendants' favor, granting the defendants a substantial recovery on their counterclaim.  For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND.

**I. BACKGROUND**

**A.   Facts**

Viewing the evidence in the light most favorable to the jury's verdict, the facts in this case are as follows:

American Realty Trust, Inc. ("ART") is a publicly traded Georgia corporation engaged in the real estate business.  It has no employees of its own, and since 1989 it has been managed and advised by Basic Capital Management, Inc. ("BCM"), a private corporation that at all relevant times also has owned a majority of ART's stock.  BCM is indirectly owned by a trust created by real estate magnate Gene Phillips for the benefit of his children.

Early in 2000, ART found itself with a need to raise additional capital and refinance certain loans.  For help in obtaining the desired new capital and financing, ART began negotiations aimed at securing the consulting services of Matisse Capital Partners, LLC ("Matisse").  Matisse's two principals, Paul Bagley and Jack Takacs, had connections to Wall Street that

would, in ART's estimation, raise ART's reputation with potential investors and financiers. Matisse was represented in the negotiations by the law firm of Andrews & Kurth. On April 13, 2000, ART, BCM, and another ART-affiliated entity entered into an agreement styled a Financial Consulting, Management and Marketing Agreement ("the Consulting Contract") with Matisse. The eleven-page document required Matisse to assist ART in arranging certain financing transactions, in exchange for which ART would pay Matisse a monthly fee of $200,000 and, on at least some transactions, a percentage commission. Matisse's duties under the Consulting Contract fell into three categories: (1) collaborating with ART to develop, within 30 days, a list of financing projects to be pursued; (2) preparing business plans, budgets, and analyses of the designated projects; and (3) assisting ART in negotiating and closing the designated projects. The Consulting Contract required Matisse to obtain ART's approval of, inter alia, "any contract or subcontract with a third party." Further, the Consulting Contract provided that "Matisse will perform its duties under this Agreement with due diligence and in a fiduciary manner."

In addition to obligating ART to pay Matisse a monthly fee and certain commissions, the Consulting Contract required ART to cause Bagley to be elected to ART's board of directors and to be installed as chairman of the board. ART also contracted to give Matisse a loan that would allow Matisse to purchase ART common

3

stock.  The Consulting Contract further required ART and BCM to use their best efforts to see to it that ART acquired an option to buy out BCM's advisory contracts with ART and other Phillips-affiliated companies, so that ART could become self-administering.

By its terms, the Consulting Contract was to run for a period of twelve months, with an automatic renewal for a subsequent twelve months on the condition that Matisse arrange for $100 million of new capital and refinance at least half of ART's outstanding land loans.  The agreement also provided, however, that it would terminate "upon election of ART, forthwith and upon notice, for any negligence, impropriety, or other wrongful act of Matisse or any of its officers, employees, or agents."

The Consulting Contract further provided that it was "subject to the approval of the Board of Directors of each of ART, BCM and [another ART-affiliated company].  If any such company's Board of Directors fails to approve this transaction, this agreement shall terminate without liability of either party."  ART's board did not approve the Consulting Contract until May 19, 2000, a bit over a month after it was signed, and BCM's board never approved it.[1]  The parties nonetheless operated

_____

[1]    At trial, it was disputed whether BCM's representatives told Bagley and Takacs that BCM's board had approved the Consulting Contract.  BCM's alleged misrepresentations about the board's approval formed the basis of Matisse's fraud claim, which

4

as if the Consulting Contract were in force.  Bagley was appointed to ART's board and made chairman of the board, as required by the Consulting Contract, on April 28.  The board also appointed Bagley to the position of chief executive officer on that date, although the corporation's bylaws did not provide for any such post.  The Consulting Contract did not require ART to appoint Bagley as its CEO, but ART believed that doing so would increase his credibility on Wall Street in his dealings on ART's behalf.  Bagley and Takacs began to work with A. Cal Rossi, who at that time was an executive vice president of both ART and BCM, on putting together a list of financing projects.  BCM paid the first monthly consulting fee to Matisse in early May, and ART made the second payment in early June.[2]  Bagley and Takacs were given office space at BCM's offices, though they rarely worked out of those offices.  ART's day-to-day operations remained under the control of the company's president, Carl Blaha.

On June 14, 2000, FBI agents searched BCM's offices, and word quickly spread that Phillips and Rossi had been indicted by a New York grand jury on federal securities charges.  The publicity surrounding the indictments precipitated a drop in the market price of ART's stock, as well as the stock of other

_____

the jury rejected and which is not at issue in this appeal.

  [2]    According to ART and BCM, ART could not make the first payment because its board had not yet approved the Consulting Contract.  But (also according to ART and BCM) BCM, which was not a public company, operated under looser financial rules.

Phillips-affiliated companies.  This drop in share prices plunged ART into a financial emergency, because ART owed margin loans secured by stock held in its affiliated companies.  ART's lenders made margin calls on ART, demanding repayment or additional collateral for the loans.  ART feared that the margin lenders would sell the margin shares at the now-depressed market price, a price that seriously undervalued the companies' underlying real estate holdings.

ART's board of directors held an emergency meeting on June 17 to discuss the company's response to the margin calls.  The board was told that efforts were being made to sell certain properties to generate cash, but that these sales would not be sufficient to meet the margin calls.  ART's main response, spearheaded by Brad Phillips, the son of Gene Phillips, was to try to negotiate forbearance agreements with each of the margin lenders in order to avoid a sale of the underpriced margin shares.  The minutes of the meeting report that Bagley inquired about the board's current delegations of authority to the corporation's officers and asked the corporation's counsel to review those delegations.  At that time, Blaha was the only officer to whom the board had delegated authority.

Bagley knew about Brad Phillips's efforts to secure forbearance agreements, but Bagley seems to have pursued a different response to the crisis.  In his view, the only way for ART to survive was to persuade the New York Stock Exchange to

6

suspend trading in the ART affiliates' stock.  In order to reassure the exchanges, Bagley believed that it was necessary to enter talks with a credible financing source capable of satisfying the margin debt.  To this end, he and Takacs began negotiating with the Hampstead Group, a large institutional investment fund.  In the negotiations with Hampstead, which continued into the evenings and over the weekend, Bagley and Takacs were assisted by the lawyers from Andrews & Kurth who had previously represented Matisse in the negotiation of the Consulting Contract.  Robert Waldman, ART's general counsel, was aware of the negotiations but was not told the details of the proposed deal.

The result of the talks with Hampstead was a Letter of Intent dated June 22, 2000, in which Hampstead expressed its interest in acquiring a majority of the margin shares held by ART.[3]  While the Letter of Intent was not binding with respect to that sale, it did contain a few binding obligations.  Most significantly, it contained a "no-shop" provision that barred ART from negotiating with any other party regarding a sale of the margin shares until August 8, 2000.  If ART breached the no-shop provision, the Letter of Intent provided that Hampstead would be entitled to reimbursement of its out-of-pocket costs expended in

_____

[3]   The Letter of Intent was actually executed between ART and SH Funding Partners, L.P., an entity created by Hampstead for purposes of the proposed transaction.  Like the parties, we will use the label "Hampstead" to refer to these associated entities.

7

connection with the proposed transaction. The Letter of Intent was signed for ART by "Paul Bagley, Chairman and Chief Executive."

None of ART's other officers or directors had any input into the Letter of Intent, and Bagley did not consult them before he signed it. When ART's board and officers learned of the Letter of Intent's terms, they were stunned and angered. The jury heard testimony from ART's witnesses that the Letter of Intent, and the no-shop provision in particular, undercut Brad Phillips's efforts to obtain forbearance agreements and contradicted his statements to the margin lenders.

A special meeting of ART's board was held on June 24 to discuss progress in dealing with the margin debt situation. Some of the directors questioned the wisdom of the Letter of Intent, criticized Bagley for not informing them about it, and expressed their belief that Bagley lacked the authority to execute it. At some point in the meeting, Bagley refused to answer any more questions until he consulted with his own counsel, and he later left the meeting. The board unanimously removed Bagley from his positions as CEO and chairman of the board. Two days later, on June 26, ART sued Matisse, Bagley, and Takacs (collectively "Defendants") in Texas state court, asserting breach of the Consulting Contract and breach of fiduciary duties, as well as other claims. Bagley resigned from his position as a director of ART on July 10.

8

## B.  Proceedings Below

Defendants removed the case to the district court on the basis of diversity of citizenship.  They also countersued ART and filed a third-party complaint against Gene Phillips and Rossi. BCM was later joined as a plaintiff.

The joint pretrial order, dated July 22, 2002, set forth the parties' various claims, defenses, and contentions.  Those claims that remain relevant for purposes of this appeal are ART's claims for breach of contract and breach of fiduciary duty, BCM's claim for breach of contract, and Matisse's counter-claim for breach of contract.  ART's breach of contract claim asserted that Defendants both failed to undertake the duties required by the Consulting Contract and affirmatively breached it by secretly negotiating the Hampstead Letter of Intent.  Alternatively, ART claimed that the Consulting Contract had terminated without further liability to pay Matisse's fees because BCM's board had never approved it.  ART's fiduciary duty count alleged that Defendants' actions with respect to the Hampstead Letter of Intent breached duties of care and loyalty owed to the corporation; these fiduciary duties arose, according to ART, both from Bagley's status as an officer and director of ART and from the Consulting Contract itself, in which Matisse promised to undertake its efforts on ART's behalf "in a fiduciary manner." As a remedy, ART sought disgorgement of Matisse's fees, as well

as "actual, consequential, and special damages" in an unspecified amount.

BCM's breach of contract claim asserted two alternative theories. First, since BCM's board never approved the contract, Defendants breached the Consulting Contract by carrying on as if it were in force, circumventing the provision requiring BCM's consent. Second, if the Consulting Contract were valid, then Defendants breached it in the same ways alleged by ART. BCM sought to recover at least the $200,000 it had paid Matisse as the first monthly consulting fee.

In its counterclaim against ART for breach of contract, Matisse contended that the Consulting Contract was valid and effective, and that ART had either waived or was estopped from asserting any defect resulting from BCM's failure to approve it. ART breached the contract, according to Matisse, by terminating it without cause, by failing to make the third monthly payment, and by failing to make the loan that would enable Matisse to purchase stock in ART. Matisse sought the $2 million of monthly consulting fees it was owed for the remainder of the first year of the Consulting Contract, and it also sought to recover the fees it would have earned in the renewal term, on the theory that ART's breach prevented Matisse from satisfying the conditions necessary to trigger the renewal.

10

Both sides additionally requested an award of attorneys' fees, as provided for under both Texas law and a provision of the Consulting Contract.

The district court denied the parties' cross-motions for summary judgment, and a jury trial followed. The ten-day trial featured over a dozen witnesses and over a hundred exhibits. At the close of the evidence, the parties filed Rule 50 motions for judgment as a matter of law. The court denied these without prejudice to entertaining the motions again after the jury's verdict.

The jury's verdict resolved almost all of the issues against Defendants. Relevantly for purposes of this appeal, the jury found in favor of ART on its breach of contract and fiduciary duty counts and in favor of BCM on its contract claim; the jury found that Matisse had not proven its breach of contract claim against ART. When asked to quantify the amount of damages the victorious plaintiffs should be awarded on each of their claims, however, the jury answered "none."

After the verdict, ART and BCM moved for entry of judgment on the verdict and Defendants renewed their motion for judgment as a matter of law. In their motion, Defendants asked the district court to set aside the verdicts in favor of ART and BCM and to enter judgment for Matisse on its breach of contract claim. The district court granted Defendants' renewed motion for judgment as a matter of law, remarking as follows: "The court

11

agrees with the arguments and authorities in the defendants'
motion.  These arguments and authorities are incorporated herein
by reference as the basis for this ruling.  Granting the
defendants' motion necessarily means, of course that the
plaintiffs' motion for entry of judgment on the verdict must be
denied."  Although Defendants' motion had asked for further
proceedings to fix damages, the court instead entered judgment
for Matisse for $4.4 million (i.e., $200,000 per month for the
remainder of the Consulting Contract, including the renewal
term), plus pre- and post-judgment interest.  The court's
judgment also awarded Matisse attorneys' fees in an amount to be
determined in a subsequent hearing.

ART and BCM now appeal the district court's judgment.[4]

## II. STANDARD OF REVIEW

We review the district court's grant of judgment as a matter
of law under Rule 50 <u>de novo</u>, applying the same standard as the
district court.  <u>See</u> <u>Coffel v. Stryker Corp.</u>, 284 F.3d 625, 630
(5th Cir. 2002).  Judgment as a matter of law is appropriate with
respect to an issue if "there is no legally sufficient
evidentiary basis for a reasonable jury to find for [a] party on
that issue."  FED. R. CIV. P. 50(a)(1).  This occurs when the
facts and inferences point so strongly and overwhelmingly in the

---

[4]    ART later filed a separate appeal, No. 03-10462,
relating to the amount of attorneys' fees awarded to Matisse in
the subsequent hearing.

12

movant's favor that reasonable jurors could not reach a contrary verdict. Coffel, 284 F.3d at 630. In considering a Rule 50 motion, the court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; the court may not make credibility determinations or weigh the evidence, as those are jury functions. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). In reviewing the record as a whole, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (citation and internal quotation marks omitted).

### III. ANALYSIS

This appeal involves claims of breach of contract and breach of fiduciary duty, claims for which state law provides the substantive rules of decision. The parties agree that Texas law governs the contract issues.[5] The parties also recognize, however, that since ART is a Georgia corporation, ART's internal

_____

[5] The Consulting Contract contains a choice-of-law clause selecting Texas law to govern all disputes. The Texas courts will enforce such clauses so long as the chosen state bears some reasonable relationship to the parties and the transaction. Lockheed Martin Corp. v. Gordon, 16 S.W.3d 127, 133 (Tex. App.—Houston [1st Dist.] 2000, pet. denied).

13

affairs (including the rights and duties of its officers and directors) are governed by Georgia law.  See Askanase v. Fatjo, 130 F.3d 657, 670 (5th Cir. 1997) ("Federal courts sitting in Texas apply the law of the state of incorporation when a corporation's internal affairs are implicated.").  We begin by discussing the district court's disposition of the breach of contract claims, then turn to the breach of fiduciary duty claims.

## A.    Breach of Contract

The jury returned verdicts in favor of both ART and BCM on their respective breach of contract claims against all three Defendants, but the jury awarded no damages.  The jury also found that Matisse had not proven its breach of contract claim against ART.  The district court disagreed and overturned the verdicts for ART and BCM and entered a sizable judgment for Matisse.  The question before us is whether the district court erred in ruling that a rational jury could reach no other conclusion.

To begin with one of the simpler aspects of this complicated case, we believe that the district court was correct to reject the jury's verdict to the extent that the jury found that Bagley and Takacs individually, as opposed to Matisse, had breached the Consulting Contract.[6]  The Consulting Contract states that it was

---

[6]    It appears that the district judge harbored concerns about this issue even before the charge was given to the jury. Before the closing statements, Defendants' counsel asked the court to "correct" the verdict form by removing Bagley and Takacs

14

"executed . . . by and between MATISSE PARTNERS, LLC, a Colorado limited liability company" and the ART corporations.  It was signed on Matisse's behalf by Takacs in his capacity as Matisse's managing director.  It is of course true that a business entity can act only through its officers, employees, and other agents.  If Matisse breached the contract, it would therefore necessarily be by virtue of acts taken by Bagley or Takacs.  But that truism does <u>not</u> mean that any breach of the Consulting Contract, which breach could only happen through those two individuals' actions, creates individual liability on Bagley and Takacs.  <u>Cf.</u> <u>Gonzales County Water Supply Corp. v. Jarzombek</u>, 918 S.W.2d 57, 59-61 (Tex. App.—Corpus Christi 1996, no writ).  To so hold would ignore the fact that Matisse's principals were doing business as an LLC.

We recognize that the Consulting Contract specifically refers to Bagley and Takacs by name and states that they will undertake services for ART, but it is still Matisse who was the promisor here.  The Consulting Contract provides that "<u>Matisse agrees</u> that these individuals will be primarily responsible for <u>Matisse's performance</u> under this Agreement, and will spend substantial amounts of time on the <u>responsibilities of Matisse</u> hereunder" (emphasis added).  As we have said, Matisse could

---

from the question relating to the breach of contract claim.  The court responded, "I don't think they were part of the contract, but . . . that's the plaintiff's contention.  I'm submitting it as the plaintiff requested."

perform under the contract only through its agents Bagley and Takacs, but that does not make the agents parties to the Consulting Contract.  Thus no action for breach of contract can lie against them.  See Bernard Johnson, Inc. v. Cont'l Constructors, Inc., 630 S.W.2d 365, 369 (Tex. App.–Austin 1982, writ ref'd n.r.e.) ("As a general rule, a suit for breach of contract may not be maintained against a person who is not a party to the contract, particularly a non-party who is assigned duties by the terms of the contract.").  Nor was there any basis for the jury to conclude that Bagley and Takacs personally formed any other contract, separate from the written Consulting Contract, with ART and its affiliates.  Therefore, we hold that the district court did not err to the extent that its judgment set aside the jury's verdict with respect to the plaintiffs' breach of contract claims against Bagley and Takacs individually, as opposed to Matisse.

To clear away another relatively straightforward issue, we also affirm the district court's judgment to the extent that it rejected the jury's verdict in BCM's favor on its breach of contract claim.  Defendants' renewed motion for judgment as a matter of law attacked the jury's verdict on BCM's breach of contract claim on the grounds that no duties under the Consulting Contract ran in favor of BCM.  While BCM is a signatory to the Consulting Contract, Defendants pointed out that BCM's main role in the agreement was its promise to assist ART in buying out

16

BCM's advisory agreements. In granting Defendants' motion, the district court implicitly accepted the argument that Matisse's duties under the Consulting Contract ran to ART, not to BCM. The appellate briefs filed by ART and BCM do not offer any argument against this aspect of the district court's judgment, and so they have waived the issue. See Gann v. Fruehauf Corp., 52 F.3d 1320, 1328 (5th Cir. 1995). Accordingly, we do not decide whether there was reversible error in the district court's judgment to the extent that it set aside the jury's verdict in favor of BCM on its breach of contract claim.

We come then to heart of the breach of contract issue, the question whether the district court erred in rejecting the jury's verdict against Matisse on ART's breach of contract claim and instead entering judgment——again notwithstanding the jury's verdict——in favor of Matisse. In framing the issue, we note that ART and Matisse agree that ART took actions inconsistent with the Consulting Contract, such as removing Bagley from his position as chairman of the board at the June 24 meeting. The critical dispute is whether Matisse had already breached the Consulting Contract before ART took those actions. ART contends that Matisse had failed to perform as promised, in particular by negotiating and signing the Hampstead Letter of Intent. Not only was the Letter of Intent unauthorized by either the Consulting Contract or Bagley's position as chairman and CEO, says ART, but Bagley and Takacs in fact pursued the Hampstead deal because it

17

would earn Matisse a commission under the Consulting Contract, not because the deal was in ART's best interests. ART argues that it therefore properly terminated the Consulting Contract. In response, Matisse contends that ART merely used the Hampstead Letter of Intent as a pretext to terminate the Consulting Contract. The true reason for ART's dissatisfaction with the consulting arrangement, according to Matisse, is that Gene Phillips had realized that his indictment would scare off investors and impair ART's ability to raise funds, meaning that there would be little to be gained from the $200,000 monthly payment to Matisse.[7] ART's suit, filed only days after the revelation of the Letter of Intent, was in Matisse's view an attempt to preempt Matisse from filing its own suit for breach of contract.[8]

Matisse's theory is not an unreasonable one. ART and Phillips may well have been looking for an excuse to slip out of

---

[7] ART had in fact failed to make the third monthly payment, which was expected on June 15, the day after the FBI searched BCM's offices. We do not take Defendants to assert, however, that this failure to make timely payment itself amounts to a material breach on ART's part. On Defendants' theory of the case, Gene Phillips and ART had decided to breach the contract soon after the crisis hit, but (again, on Defendants' view) ART's actual breach of the Consulting Contract did not occur until later, probably at the June 24 board meeting. While ART's failure to make the payment on June 15 might well have given Matisse the right to suspend its own performance until it received assurances, Defendants' position is that they in fact redoubled their efforts when ART ran into its financial crisis.

[8] The district judge remarked on more than one occasion that Matisse should have been the true plaintiff in this case.

the Consulting Contract.  The jury, however, which had the benefit of seeing and hearing the witnesses firsthand, rejected Matisse's pretext theory.  Based on our review of the record, we believe that there was sufficient evidence for them rationally to reach that conclusion.  If the jury credited the testimony of ART's witnesses, the jury could have found that ART believed that Matisse had breached the Consulting Contract, as the jury itself found.  To the extent that Defendants advance a different reading of the facts, their argument must fail.  See Reeves, 530 U.S. at 150 (stating that the court "may not make credibility determinations or weigh the evidence" in ruling on a Rule 50 motion).

Defendants' argument does not, however, rest solely on an effort to re-weigh the disputed evidence.  The legal centerpiece of the argument in Defendants' renewed Rule 50 motion to the district court, as well as in their brief on appeal, is the contention that Bagley's actions with respect to the Hampstead Letter of Intent simply cannot constitute a breach of contract on Matisse's part, for the Letter of Intent reveals on its face that Bagley signed it for ART in his capacity as CEO and chairman of the board, not in his capacity as an agent of Matisse.  Defendants repeatedly press upon us the importance of realizing that Bagley had two distinct roles vis-à-vis ART: one as a financial consultant to ART under the Consulting Contract and one as ART's chairman/CEO.  Defendants ask us to conclude that

19

Bagley's deeds in the latter role as a corporate representative of ART are therefore irrelevant, as a matter of law, with respect to Matisse's performance under the Consulting Contract.

It is of course true, as Defendants argue, that the same individual can act in distinct legal capacities. We do not believe, however, that this well-settled principle is determinative of the rather unusual case before us today. Although Bagley had two different legal personalities——Matisse consultant on the one hand and ART officer/director on the other——we believe that his actions in his capacity as an ART officer and director could still amount to a breach of the Consulting Contract. The Consulting Contract called for Bagley to be installed as chairman of the board and required that Matisse's duties, to be discharged by Bagley and Takacs, be performed "with due diligence and in a fiduciary manner." Therefore, given the peculiar nature of the Consulting Contract, any malfeasance undertaken in Bagley's role with ART could breach both Matisse's contractual duties to ART as well as Bagley's distinct, corporate-law duties to ART. That is, although we agree with Defendants that the two sets of duties are conceptually distinct, it is also the case that the same conduct can in practice violate both sets of duties. Otherwise, the contract would saddle ART with a duty to continue paying faithless and negligent consultants, as long as the consultants' trespasses were accomplished under ART's name.

Defendants' own arguments recognize the soundness of our conclusion. One of the ways in which ART breached the Consulting Contract, on Defendants' view of the case, was in removing Bagley from his position as chairman in contravention of the one-year appointment specified in the Consulting Contract. ART's removal of Bagley altered the corporate-law relationship between ART and Bagley, but, on Defendants' own view, it also simultaneously breached the Consulting Contract, which installed him as chairman in the first place. Just as Defendants would have us recognize that ART's actions against Bagley in his corporate role with ART could constitute a breach of the Consulting Contract between ART and Matisse, so too do we recognize that Bagley's actions in his corporate role with ART can violate that same agreement.[9] We note as well that the Hampstead negotiations, along with other events that might have constituted a breach of the Consulting Contract, were not solely attributable to Bagley; Takacs took part in these activities as well, as did Matisse's counsel, Andrews & Kurth, making it very much a Matisse operation (or so a jury was entitled to find). As such, Matisse's failure to obtain

---

[9] Corporate executives' relationships with the corporation are often governed by contractual duties as well as by status-based duties imposed by corporate law. Texas law and Georgia law both provide that although a corporate board can remove an executive at any time, the individual can still sue the corporation for thereby breaching his or her employment contract. See O.C.G.A. § 14-2-844; TEX. BUS. CORP. ACT ANN. art. 2.43 (Vernon 2003).

ART's approval of the Letter of Intent could also have been found by the jury on this record to breach the Consulting Contract.

Since there was a legally sufficient basis for the jury's conclusion that ART proved at trial that Matisse breached the Consulting Contract, the district court erred in overturning that portion of the verdict. For the same reason, the district court also necessarily erred in entering judgment as a matter of law in Matisse's favor, and awarding a substantial recovery, on Matisse's breach of contract claim.

## B. Breach of Fiduciary Duty

ART's complaint alleged that Defendants breached the fiduciary duties they owed to ART. According to ART, these duties arose from two sources: (1) Bagley's status as an officer and director of ART and (2) the contractual arrangement between Matisse and ART. The district court instructed the jury that Matisse was ART's agent, and that an agent owes fiduciary duties to its principal; it likewise charged the jury that officers and directors owe fiduciary duties to the corporation they serve. The court further instructed that these duties required Bagley and Matisse to

> deal fairly and honestly with ART, to make reasonable use of ART's confidences, to act in the utmost good faith and with the most scrupulous honesty toward ART, to fully and fairly disclose all important information to ART, to place ART's interests before their own, and not to use their position as agent, officer, or director to the detriment of ART.

22

The jury's verdict was that both Bagley and Matisse breached fiduciary duties owed to ART.  As with the contract claim, however, the jury awarded ART no damages.[10]

Although ART's complaint included separate counts for breaches of the duties of care and of loyalty, and the pretrial order also mentioned both theories, the charge to the jury spoke generically of "fiduciary duties" without distinguishing between the distinct types of duties.[11]  The parties do not challenge the content of the jury instruction, however.  For purposes of our assessment of the legal sufficiency of the jury's verdict, therefore, we need only ask whether there was sufficient evidence

---

[10]     The verdict form included a question asking whether Takacs was vicariously liable for Bagley's or Matisse's breach of fiduciary duty on a theory of civil conspiracy.  The verdict form instructed the jury to skip this question, however, since the jury awarded ART no damages.  The verdict with respect to Takacs is not an issue in this appeal.
   In their motion for entry of judgment on the verdict, ART and BCM requested disgorgement of the $400,000 paid to Matisse under the Consulting Contract; they argued that disgorgement was required as a matter of law when there has been a breach of fiduciary duty, despite the jury's verdict that they were entitled to no damages.  This issue has not been pursued on appeal, and it is therefore waived.

[11]     The distinction between the duties of loyalty and of care was relevant at trial because ART's articles of incorporation arguably waive the corporation's right to recover against officers and directors for breaches of the duty of care. When ART moved for entry of judgment on the verdict, Defendants argued that the verdict was ambiguous in that the jury instructions, while apparently focusing on the law of the duty of loyalty, also referred to incidents that arguably implicated the duty of care.  Since the district court rejected the verdict, the court did not have any occasion to decide which duty was breached.

23

for the jury to find a breach of fiduciary duty according to the law that they were given.

We begin with the jury's finding that Bagley breached his fiduciary duties to ART. Upon examination of the record, we conclude that a rational jury could have found that Bagley failed to satisfy the standard expressed in the jury instruction. Not only did Bagley fail to consult with ART's board and other officers about executing the Letter of Intent, but, according to ART's witnesses, Bagley in fact actively kept ART's people in the dark about the details of the Letter of Intent. ART's board learned of the terms only after the Letter of Intent had been signed. Bagley was advised in the Hampstead negotiations by the law firm of Andrews & Kurth, the same firm that had earlier represented Matisse, adverse to ART, in negotiating the Consulting Contract. Waldman, ART's own general counsel, was unaware of the nature of the agreement that was being contemplated. These actions violate, at a minimum, Bagley's duty "to fully and fairly disclose all important information to ART." We conclude that the jury's verdict against Bagley on ART's fiduciary duty count was therefore sound.[12]

---

[12] ART contended at trial that Matisse stood to earn a fee on the Hampstead deal (unlike the forbearance agreements that Brad Phillips was busy arranging) and that Defendants' own financial interests therefore led them to pursue an agreement that was disadvantageous for ART. Defendants responded that they had no personal stake in the Hampstead deal because the Consulting Contract did not entitle them to any fee on a transaction such as that contemplated in the Letter of Intent.

24

The jury also found that Matisse, in addition to Bagley individually, had breached fiduciary duties owed to ART. Unlike Bagley, Matisse was of course not an officer or a director of ART. According to the jury instructions, the fiduciary relationship between Matisse and ART arose from Matisse's position as ART's agent under the Consulting Contract.[13] In their renewed motion for judgment as a matter of law, Defendants argued that Matisse could not have violated any fiduciary duty because: (1) an entity cannot breach contractually created fiduciary duties when it has not breached the underlying contract, and (2) Bagley had not violated fiduciary duties he owed to ART, so no breach on his part could be attributed to Matisse. Since the predicates for those arguments are no longer available in light of our dispositions of the other claims in this case, the jury's verdict should be reinstated to the extent that it found against Matisse on ART's breach of fiduciary duty claim.

---

The parties' dispute stems from a disagreement over the scope of a "catch-all" clause that obligated ART to pay Matisse a commission on additional transactions not specifically mentioned in the Consulting Contract. ART produced some rather thin evidence that possibly tended to show that the Matisse consultants expected to earn a commission on the Hampstead deal. We need not decide if there was sufficient evidence to support a finding of self-dealing, however, for the jury instruction does not require proof of self-dealing.

[13] Regardless of whether or not such a characterization of the parties' relationship is accurate, Defendants have not objected to it.

25

## C.    Proceedings on Remand

The district court's judgment notwithstanding the verdict also gave Matisse, as the newly prevailing party, an award of costs and attorneys' fees in an amount to be determined in a subsequent hearing.  Since we have now partially reversed the district court's judgment and reinstated portions of the jury's verdict, we remand the case to the district court to vacate the award of attorneys' fees to Matisse,[14] see Coffel, 284 F.3d at 641, and to determine ART's entitlement to attorneys' fees (if, indeed, ART is so entitled, as to which we intimate no opinion).

## IV. CONCLUSION

We conclude that the district court properly granted some portions of Defendants' renewed motion for judgment of law, but we also hold that the district court erred in granting other portions.  We AFFIRM the district court to the extent that it entered judgment in favor of all three Defendants on BCM's breach of contract claim and in favor of Bagley and Takacs on ART's breach of contract claim.  We REVERSE the district court's entry of judgment in Matisse's favor on its breach of contract claim, and REMAND for entry of judgment in favor of ART on ART's breach of contract claim against Matisse and on ART's breach of

---

[14]    We recognize that ART's appeal of the district court's order fixing the amount of attorneys' fees was dismissed. However, Matisse's entitlement to such fees was the subject of this appeal, and is disposed of contrary to Matisse herein.

26

fiduciary duty claim against Matisse and Bagley, with no damages to be awarded to ART on any of such claims. We REVERSE the district court's finding that Matisse was entitled to attorneys' fees, and we REMAND for a determination of ART's entitlement to attorneys' fees and for further proceedings consistent herewith. Costs shall be borne by Matisse.