# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 23, 2012

No. 10-20741

Lyle W. Cayce
Clerk

CLYDE H. BOHNSACK,

Plaintiff-Appellee,

v.

VARCO, L.P.,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and STEWART and SOUTHWICK, Circuit Judges.
CARL E. STEWART, Circuit Judge:

Varco, L.P. ("Varco") appeals from a jury verdict awarding Clyde H. Bohnsack compensatory damages and punitive damages for fraud and compensatory damages for misappropriation of trade secrets. Because Bohnsack did not prove that he was entitled to damages on his fraud claim, we RENDER a take-nothing judgment on Bohnsack's fraud claim, and we REVERSE the jury's award of punitive damages. Because the verdict for misappropriation of trade secrets was supported by sufficient evidence, we AFFIRM the jury's verdict on Bohnsack's claim for misappropriation of trade secrets.

No. 10-20741

## I.

This dispute is between Clyde Bohnsack, a drilling fluids engineer, and Varco,[1] a company that cleans drilling fluids. Drawing on several decades of experience in the industry, Bohnsack invented the "Pit Bull," a machine intended to make the process of cleaning drilling fluids more efficient. Bohnsack and Varco negotiated over the right to manufacture the Pit Bull for several years. After Varco pulled out of these discussions, Bohnsack sued Varco for fraud and for misappropriation of trade secrets. A jury found for Bohnsack on both claims and awarded him compensatory damages and punitive damages. We summarize the relevant facts below.

*The Role of Drilling Fluids.* Drilling fluids serve two essential functions in oil wells: they lubricate the drill bit and carry solids back up to the surface. As a drill bit tears through the ground and accumulates earth, drilling fluids are pumped down into the well. While in the well, the fluids mix with the drilled cuttings–sand, rock, and clay–ripped up by the drill bit. The mixture of drilling fluid and drilled cuttings, referred to in the industry as drilling mud, returns to the surface through a pipe.

Varco purifies drilling mud so it can be reused. After the drilling fluid returns to the surface as drilling mud that contains drilled cuttings, Varco's machinery cleans the drilling mud by separating the drilled cuttings from the drilling fluid. The separation is done in stages by sending the mud through several machines–shell shakers, desilters, and desanders–located in tanks next to the oil rig.[2]

---

[1] The defendant is referred to by different names in the Record on Appeal. For simplicity's sake, we only use "Varco."

[2] By the time this process is complete, the drilled cuttings have gone into one tank and the drilling fluid has gone into another. The drilled cuttings are stirred and then pumped out into containers which are hauled away by dump trucks for disposal. Finally, the drilling fluid is examined by a drilling fluid specialist, who ensures that the resulting fluid can be reused.

No. 10-20741

A hitch in the process arises, however, when the particles in the drilling mud accumulate in the tanks that hold the shell shakers, desilters, and desanders. Since the mud sits in these tanks until it is ready to be transported to the next stage of the cleaning process, solids pile up in the tanks as the cuttings settle. Because tanks that contain debris cannot be moved, the accumulation of solids becomes inconvenient whenever the drilling of a well is complete and tanks must be transported to a new well. If a tank is loaded down with cuttings, workers must dig out the cuttings before the tank can be moved, at significant time and expense.

*The Pit Bull.* To alleviate this problem, Bohnsack designed the Pit Bull, a portable pumping machine that reduces the volume of cuttings that remain in tanks after the mud passes through. The Pit Bull contains a Mission 6 x 8 pump with a sixty horsepower motor and a twin-jet designed rotating head. The invention's jetting action causes mud to be pumped to the top of the tank through a hose, and then sends the mud back into the tank. In this way, the Pit Bull uses suction to prevent the drilled cuttings from settling at the bottom of the tank. At trial, a Varco employee estimated that each time a well is completed, the use of the Pit Bull saves workers one or two days that would otherwise be spent digging and hosing drilled cuttings out from the tanks.

*Beginning of Negotiations Between Bohnsack and Varco.* After negotiations over the Pit Bull with one of Varco's competitors did not progress,[3] Bohnsack presented his idea to Varco on July 29, 2003. That same day, Bohnsack entered into a mutual secrecy agreement with Varco requiring Varco to keep secret all information provided by Bohnsack, and providing that such information would remain property of Bohnsack.[4] Shortly after signing the first

---

[3] Bohnsack first offered the Pit Bull to Swaco, Varco's largest competitor. Swaco and Varco are the two largest competitors for this business, with Halliburton a distant third.

[4] This agreement would be continuously renewed over the next several years.

3

No. 10-20741

mutual secrecy agreement with Varco, Bohnsack spent between two and three weeks working with two employees of Varco to build a prototype of the Pit Bull.

*The Patent Application.* After Bohnsack said he was interested in seeking a patent for the Pit Bull, Varco began the process of obtaining one. On October 13, 2005, E.J. Kubena, a manager of marketing for Varco, sought permission to apply for a patent from two Varco executives: Kevin McDonough, a vice president of manufacturing and engineering, and Richard Koch, a subordinate of McDonough who was responsible for new product development. Kubena wrote, "We need to cover the device since we will probably market the unit." He added that Varco was currently testing the unit and that Halliburton wanted four units,[5] and he described the Pit Bull in positive terms: "The unit reduces overall solids content in the mud system and helps save mud by not having to dump and wash mud pits out." In response, Koch asked if Bohnsack worked for Varco and wrote that if Varco would be the exclusive owner of the patent, Kubena should attempt to protect Varco's intellectual property rights.[6]

Kubena then asked Guy McClung, an outside lawyer who frequently prepared patents for Varco, to apply for a patent for the Pit Bull. As source material for the application, McClung received from Varco a drawing and written descriptions of the Pit Bull. On October 19, 2005, McClung filed a patent application. McClung had neither seen the Pit Bull nor spoken to Bohnsack about the invention at the time he drafted the application. Nevertheless, the patent application prepared by McClung stated that, because McClung had added ideas to the drawing, McClung was a co-inventor of the Pit Bull. At this point, while the patent application had been submitted, the

---

[5] At trial, Kubena testified that his belief that Halliburton was interested in the Pit Bull came solely from Bohnsack.

[6] Bohnsack did not work for Varco. Of course, Koch likely asked whether he did because of the effect an employment relationship would have on Varco's ownership rights in the patent.

No. 10-20741

declaration that accompanies patent applications had not yet been signed by Bohnsack or submitted to the United States Patent and Trademark Office ("Patent Office").[7]

On November 8, 2005, Bohnsack traveled to Houston for the purpose of signing the declaration, which stated, among other things, that both Bohnsack and McClung were responsible for the invention. In addition to asking Bohnsack to sign the declaration, Varco also asked Bohnsack to sign a document that would have transferred all of Bohnsack's rights in the Pit Bull to Varco. Bohnsack met with McDonough to discuss the declaration and assignment of rights. McClung was not present at the meeting, but Bohnsack and McDonough spoke to him by telephone. Although Bohnsack was upset that McClung had named himself as inventor, he signed the declaration after speaking with McDonough and McClung. Bohnsack did not sign the document that would have assigned his rights in the Pit Bull to Varco.

Bohnsack quickly developed second thoughts about signing the declaration. Two days after signing the declaration, Bohnsack told McClung by e-mail that he had limited knowledge of patent law and did not understand why McClung was listed as an inventor, and asked to speak with McClung before McClung submitted the declaration. In response, McClung wrote that he was not Bohnsack's lawyer, and advised him that Bohnsack could seek legal counsel; asked Bohnsack to send information regarding Bohnsack's contribution to the Pit Bull; and said that he would not file the declaration until "we have sorted this all out." Bohnsack wrote back with a letter that seemed to acknowledge certain features of the Pit Bull that Bohnsack had contributed and others that McClung had contributed. Bohnsack testified that he used the letter to express his concerns about McClung's alleged additions because they did not further

---

[7] In addition to submitting a patent application, inventors must sign a declaration certifying that information contained in the patent application is accurate.

5

what Bohnsack was trying to accomplish in the patent. Bohnsack also wrote to McClung, "If [Varco] wants to include these in the application, go for it. I just want to know who made the decision and why." Bohnsack asked for a telephone conference to discuss the matter further. McClung replied with only the following: "Clyde – I have received [your] materials and will get back to you soon."

At that point, communication between Bohnsack and McClung ceased. On February 17, 2006, Bohnsack made another attempt to contact McClung to ask how the patent application and search were progressing, but McClung did not respond. On October 4, 2006, Bohnsack again followed up regarding the patent application process, this time with McDonough. He asked McDonough prior to a test of the Pit Bull if "appropriate steps [have] been taken through Guy McClung to protect interests?" On October 6, McDonough replied to Bohnsack's email to confirm that appropriate steps had been taken.

In the months following McClung's final correspondence with Bohnsack, two events of note transpired with respect to the patent application. On December 9, 2005, McClung assigned his rights in the Pit Bull patent to Varco. Then, on March 6, 2006, McClung filed the declaration to the patent application containing Bohnsack's signature. Although he had earlier promised not to file the declaration until "we have sorted this all out" and promised to "get back to [Bohnsack] soon," McClung neither consulted with Bohnsack before filing the declaration nor informed him after filing it.

*Testing of the Pit Bull.* Varco set up several tests of the Pit Bull, though more slowly than Bohnsack wished.[8] The first occurred in Montana on October

---

[8] Bohnsack repeatedly made his frustrations with Varco known. Several weeks after Bohnsack signed the patent declaration, Bohnsack spoke to Mark Lapeyrouse, then Varco's Vice President for U.S. Operations, to express his disappointment with the pace at which the Pit Bull was proceeding, and threatened to take the project elsewhere. Lapeyrouse testified that he told Bohnsack he could do so, since they did not have an agreement preventing this

No. 10-20741

3, 2005. After the test, Bohnsack wrote to Kubena contending that the tests had shown how effective the Pit Bull was and urging that it be produced immediately. Kubena agreed and said he would make a presentation to Mark Lapeyrouse, who was then Varco's Vice President for U.S. Operations. On December 10, 2006, Lapeyrouse sent an email to Bohnsack in which he told Bohnsack that he needed more field data to support the Pit Bull's performance. The email also asked Bill Crabbe, Varco's vice president of marketing, to make the project a top priority and to keep Bohnsack "[one] hundred percent informed." Two days later, in response to Lapeyrouse's email, Crabbe told Lapeyrouse that he would be having a meeting the next day to finalize the field testing data that Varco would need to gather, and that the company hoped to have enough data after this testing to determine how it would move forward. Another field test occurred in early October 2006 in Ruston, Louisiana. In addition to the field testing, the Pit Bull also underwent lab testing at Varco's offices.

The month after the Louisiana field test, Varco prepared a business plan for the Pit Bull. According to the plan, the Pit Bull had performed well in the two field tests conducted up to that point.[9] The plan described the Pit Bull as a unique product that could potentially lead to large profits, but it noted that an existing product known as an agitator, a model of which Varco sold, could, when

---

from happening. On December 6, Bohnsack emailed McClung, Lapeyrouse, and Kubena, asking them for an update on activity on the patent. Lapeyrouse acknowledged that the project has "dragged on more time now" and he therefore "appreciate[s Bohnsack's] frustration." On January 17, 2006, Bohnsack sent an email to E.J. Kubena again expressing his frustration with Varco, noting that he planned on moving forward on the invention with or without Varco. On April 19, 2006, Bohnsack wrote to Lapeyrouse and told him that he wanted to move forward with the Pit Bull and was willing to do so with his own company if necessary.

[9] A third field test would take place in May 2007.

properly used, perform the same function as the Pit Bull for a cheaper price. This fact, the document said, could complicate the marketing of the Pit Bull.

*Negotiations Between Varco and Bohnsack Intensify, Then Abruptly Fall Apart.* After Varco drafted this business plan, negotiation of terms for the use of Pit Bull began in earnest. In response to Bohnsack's request for a meeting, Crabbe offered to meet "in mid-March to make a formal offer on a go forward plan of action between [Varco] and yourself." On March 20 and 21, Bohnsack met with several Varco representatives to discuss the financial arrangements that would allow Varco to use the Pit Bull.

An exchange of proposals and counterproposals followed the March meeting. Shortly after the meeting, Crabbe outlined a fifteen-point proposal for financial arrangements between Varco and Bohnsack for Varco's use of the Pit Bull. Bohnsack responded to Crabbe's proposed agreement with a counterproposal on March 28. Crabbe replied to Bohnsack on April 17 with another counterproposal: $150,000 to Bohnsack up front, 15% of revenues to Bohnsack, a $25,000 consulting fee to Bohnsack, and a $100,000 annual payment to Bohnsack for Bohnsack's IP rights until Bohnsack receives $450,000 or until Varco discontinues the product. These payments were capped at $2,750,000. Apparently believing an agreement was close, Crabbe added that once the parties have "agreed in principle," they would send the agreement to Varco's legal department so it could draw up the formal documents. Bohnsack responded with yet another counterproposal, this one very similar to the offer sent by Crabbe. The differences were a lower total cap of $2,450,000 and more specific formulations of several of the terms: Bohnsack proposed that the 15% of revenue belonging to him be calculated "prior to expenses and any tax consequences"; he added "justified travel expenses" to the consulting fee; and he specified the exact dates of the $100,000 annual payments, though it was unclear whether he had agreed to Varco's proposal that those annual payments

No. 10-20741

be contingent on Varco's business decisions.  Bohnsack also wrote that his counsel would have to review any formal agreement.

On June 11, Bohnsack asked Crabbe and Lapeyrouse for the status of the Pit Bull negotiations.  Bohnsack wrote that he believed they were waiting to receive a document from Varco's lawyers.  Crabbe responded that same day, indicating that he had received a draft contract from Varco's legal department that he would review the next day and then send to Lapeyrouse for approval.  Once Lapeyrouse approved, Crabbe said, Bohnsack would receive the document for final approval.  The next day, Crabbe wrote to Bohnsack to tell him that he was not pleased with the draft he had received from the legal department, so he would "get [Bohnsack] a proper document" the following week.

Before Bohnsack received a formal document from Varco memorializing their "agree[ment] in principle,"[10] however, Varco abruptly pulled out of the discussions.  On the morning of June 22, McClung wrote an e-mail to Crabbe informing him that Varco and Bohnsack have equal undivided interests in the patent, and they will not owe the other any share in proceeds from selling or licensing the patent.  Later that morning, Crabbe told Bohnsack that Varco would not proceed with the Pit Bull but that Varco wished to retain an interest.  Crabbe later would testify that he "assume[d]" that he had read McClung's e-mail before speaking to Bohnsack.  Bohnsack sent an e-mail to Crabbe memorializing this conversation and explaining his intent to continue with the development of the Pit Bull.

*Bohnsack's Continued Attempts to Develop the Pit Bull.*  Eventually, Varco relinquished its interest in the Pit Bull to Bohnsack.  On September 6, 2007,

---

[10] While Crabbe testified that Varco had never "agreed in principle," the e-mail he wrote in which he said that he would send terms to Varco's legal department once Varco and Bohnsack "agreed in principle" was sufficient evidence for the jury to conclude that, since Crabbe had sent terms to Varco's legal department, an agreement in principle had been reached.

No. 10-20741

Varco issued a "New Project Development Status Report" for the Pit Bull, which claimed that the unit would not be operated any further. On October 12, Michael Huppert,[11] who had been retained as counsel by Bohnsack for the purposes of filing for a patent, wrote to Crabbe and Lapeyrouse demanding that Varco assign its full interest in the Pit Bull to Bohnsack since Bohnsack had developed the invention himself. While McClung initially responded to Huppert's demand with a letter arguing that Bohnsack and McClung had invented the Pit Bull jointly, Varco assigned its rights in the Pit Bull to Bohnsack on May 9, 2008.

Bohnsack never obtained a patent for the Pit Bull. On March 17, 2008, the Patent Office issued an office action in response to the patent application filed by McClung for the Pit Bull in which it questioned the originality of the idea as it was presented by McClung. On September 17, Huppert filed a new patent application for the Pit Bull on Bohnsack's behalf that added materials to McClung's application. Shortly thereafter, in November 2008, Bohnsack abandoned this application because he realized that he would be barred from obtaining a patent for the Pit Bull. Inventors must file an application within one year of using their idea commercially. *See* 35 U.S.C. § 102(b). Because Bohnsack had commercially used the Pit Bull in July 2007, he was required to file his patent application for the Pit Bull by July 2008. Huppert did not learn that Bohnsack had put the Pit Bull to commercial use in July 2007 until after the one-year grace period had ended, leaving him unable to file an application before the bar took effect.

Bohnsack proceeded to develop the Pit Bull on his own without a patent. According to Bohnsack's trial testimony, four Pit Bulls were in operation at the time of the trial.

---

[11] Michael Huppert is the brother of Andrew Huppert, Bohnsack's attorney on appeal.

No. 10-20741

*Lawsuit, Trial, and Verdict.* Varco initially filed suit against Bohnsack seeking a declaratory judgment holding that it did nothing wrong. Bohnsack countersued Varco and joined McClung as a third-party defendant. Before trial, the court dismissed Varco's claims and the parties stipulated to the dismissal of claims against McClung. The court also realigned the parties and limited the causes of action to fraud and misappropriation of trade secrets.

The trial lasted five days. At the close of Bohnsack's evidence, Varco moved for judgment as a matter of law, and the district court denied the motion. The jury found Varco liable for both fraud and misappropriation of trade secrets and awarded compensatory damages of $600,000, supported by both the fraud verdict and the misappropriation of trade secrets verdict, and punitive damages of $7,500,000 based only on Bohnsack's fraud claim. The district court denied Varco's post-judgment motion for a new trial or judgment as a matter of law. This appeal followed.

## II.

"Denial of a motion for judgment as a matter of law is reviewed de novo." *SMI Owen Steel Co., Inc. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008). A motion for judgment as a matter of law should be granted if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party. *Pineda v. United Parcel Serv., Inc.,* 360 F.3d 483, 486 (5th Cir. 2004). The court's standard of review with respect to a jury verdict is especially deferential. *SMI*, 520 F.3d at 437. The court reviews all of the evidence in the record, draws all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence. *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001).

Varco raises challenges relating to the jury's verdicts of fraud and misappropriation of trade secrets and to the jury's award of punitive damages.

No. 10-20741

## A.

We first consider the challenges arising out of the fraud verdict.  In Texas, a plaintiff alleging fraud must prove

> a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.

*Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994) (internal quotation marks and emphasis omitted).

Bohnsack points to two statements made by McClung that he contends were fraudulent misrepresentations.  First, McClung told Bohnsack that he would not submit the signed declaration to the Patent Office "until we have sorted this out."  Second, McClung told Bohnsack that he "received [Bohnsack's] materials and will get back to [Bohnsack] soon" in response to the information Bohnsack sent to McClung about Bohnsack's contribution to the Pit Bull.

In effect, Bohnsack argues that the fraud verdict finds support from two related but distinct legal theories, both based on those same two misrepresentations.     Bohnsack's first theory is common law fraud.  *See, e.g., Sears, Roebuck & Co.*, 877 S.W.2d at 282.  Under this theory, Bohnsack argues that the misstatements induced him to spend two years developing the Pit Bull with Varco to the exclusion of other business opportunities.  Bohnsack contends that this common law fraud theory permits recovery of damages based on the value of the Pit Bull, because in the absence of the misrepresentations, he could have profited from the invention in other ways.  Bohnsack's second theory is fraudulent inducement, a species of fraud that requires the plaintiff and defendant to have entered into an enforceable contract.  *See, e.g., Formosa Plastics Corp. USA v. Presidio Eng. & Contractors*, 960 S.W.2d 41, 49 (Tex. 1998).  Bohnsack argues that he was fraudulently induced to enter into a

contract with Varco because of McClung's misrepresentations. Pursuant to this fraudulent inducement theory, he contends that he is entitled to benefit-of-the-bargain damages in the amount of the value of the contract. The parties agree that the definition of "fraud" in the jury instructions permitted the jury to enter a verdict based on either of these theories, and that it is not clear from the verdict which theory the jury adopted.

Varco's challenges to the district court's denial of judgment as a matter of law on the fraud claim implicate both of these theories. With respect to the common law fraud theory, Varco contends that the evidence presented by Bohnsack did not support either detrimental reliance or causation, both elements required to prove common law fraud. Varco further argues the benefit-of-the-bargain damages sought by Bohnsack are not available under Texas law pursuant to a common law fraud theory. With respect to Bohnsack's theory of fraudulent inducement, Varco argues that Bohnsack did not satisfy the elements of fraudulent inducement because any misrepresentations made by McClung did not induce Bohnsack to enter into the agreement with Varco; and the "agree[ment] in principle" between Bohnsack and Varco did not rise to the level of a contract. Finally, Varco argues that it cannot be held liable for any misrepresentations made by McClung under either the common law fraud theory or the fraudulent inducement theory, because it did not control his behavior.

We begin by considering Varco's argument that it cannot be held vicariously liable for the statements of its outside counsel, which applies to both theories; we then consider the arguments Varco makes attacking a verdict based on common law fraud; and we finally consider the arguments attacking a verdict based on fraudulent inducement.

### 1.

Varco argues that the district court erroneously denied its motion for judgment as a matter of law because it cannot be held responsible for the

misrepresentations of McClung.   While Varco bases this contention on its argument that McClung was an independent contractor, Varco has waived this argument.  During its closing argument at trial, Varco argued that McClung was Varco's employee.   Varco is not permitted to argue on appeal that McClung is an independent contractor when it argued the opposite during trial.  *See United States v. Kelly*, 961 F.2d 524, 528 n.5 (5th Cir. 1992) (discussing cases in which courts did not consider points conceded in trial court proceedings), *abrogated on other grounds by United States v. Calverley*, 37 F.3d 160, 163 (5th Cir. 1994). Accordingly, we consider the standards for vicarious liability for employer-employee relationships.

Employers are vicariously liable for the torts of employees that are "committed in the course and scope of their employment."  *Medina v. Herrera*, 927 S.W.2d 597, 601 (Tex. 1996); *see also* Restatement (Third) of Agency § 7.07 (1).  "An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control."  *Id.* § 7.07 (2).

Here, a rational jury could have found that McClung was performing work assigned by Varco and was subject to Varco's control when he communicated with Bohnsack about the process for patenting the Pit Bull.  The evidence showed that Varco instructed McClung to prepare the patent for the Pit Bull. The evidence also showed that senior managers at Varco instructed McClung to respond by telephone to questions raised by Bohnsack when Bohnsack visited Varco's Houston offices.  That McClung assigned his interest in the Pit Bull to Varco after declaring himself a co-inventor provides further support for an inference that McClung was subject to Varco's control.  The jury had sufficient evidence to conclude that Varco should be held vicariously liable for McClung's actions.  We therefore reject Varco's argument that the district court erred by

No. 10-20741

failing to enter judgment as a motion of law because Varco should not have been held responsible for McClung's acts.

**2.**

We next address the arguments raised by Varco with respect to common law fraud. Varco argues that Bohnsack did not prove the elements of common law fraud for two reasons: Bohnsack did not justifiably rely on the alleged misrepresentations and Bohnsack's reliance did not cause his injury. Additionally, Varco argues that a common law fraud claim cannot support the damages found by the jury.

**i.**

We first consider Varco's contention that Bohnsack did not prove that he relied on McClung's misrepresentations. "[F]raud does not exist unless the defendant's representations induced the plaintiff to take a particular course of action. It is not necessary that the representations were the sole inducement, but the representations relied upon must have been a material factor in inducing the plaintiff's action." *Coffel v. Stryker Corp.*, 284 F.3d 625, 636 (5th Cir. 2002) (applying Texas law). Statements that induce a plaintiff to refrain from acting are also actionable. *Worldwide Asset Purch. v. Rent-A-Center E.*, 290 S.W.3d 554, 566 (Tex. App.–Dallas 2009); Restatement (Second) of Torts § 531.

The evidence presented by Bohnsack was sufficient for a reasonable jury to conclude that the misrepresentation of Varco's agent was "a material factor" in inducing Bohnsack's decision to continue working with Varco to develop the Pit Bull, to the exclusion of other business opportunities. Bohnsack testified that he was reassured that Varco was not infringing upon his rights in the Pit Bull by McClung's assurances that McClung would not file the declaration before speaking again to Bohnsack. The jury could further infer from Bohnsack's repeated attempts to discuss the patent situation with McClung and others at Varco that Bohnsack believed that protection of his rights in the Pit Bull was an

important aspect of the negotiations with Varco.   Based on the evidence presented, a jury could then conclude that Bohnsack's confidence that his rights were protected was "a material factor" in his decision to continue working with Varco.   For these reasons, the evidence presented was sufficient to prove inducement.

## ii.

We next consider Varco's contention that Bohnsack did not prove any injury resulted from his reliance on the misrepresentations of Varco's outside counsel.   Under Texas law, a plaintiff must show he was injured because of his reliance on a misrepresentation to recover for fraud.   *Sears, Roebuck & Co.*, 877 S.W.2d at 282.   Varco contends that Bohnsack did not show that any harm resulted from McClung's indication that he would not file the patent application. Varco points out that, after the agreement between Varco and Bohnsack fell apart in 2007, Varco assigned to Bohnsack all of Varco's rights in the Pit Bull patent, and Bohnsack did not prosecute the patent.   Given Bohnsack's failure to prosecute the patent after Varco had assigned all of its rights to him, Varco argues, Bohnsack cannot show that McClung's filing of the declaration affected him at all.

Taking the facts in the light most favorable to the verdict, the jury had sufficient evidence to determine that Bohnsack was injured because of his reliance on Varco's misrepresentations.   Under Texas law, lost profits are a cognizable injury.   *See Formosa Plastics*, 960 S.W.2d at 49 n.1; *S. Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1121 (5th Cir. 1984).   A jury could have found that because Bohnsack relied on McClung's statements that he would not file the patent without Bohnsack's consent, Bohnsack continued negotiating with Varco, thus losing out on the profits that would have resulted from offering the Pit Bull to other companies.   That Bohnsack was unable to prosecute a patent for the Pit Bull after Varco assigned its rights to him in May 2008 is irrelevant to

Bohnsack's ability to market the Pit Bull to other companies from November 2005 until June 2007, the time period during which the jury could have found that Bohnsack was injured by his reliance on Varco's misrepresentation. Accordingly, the district court did not err on this ground when it denied Varco's motion for judgment as a matter of law.

### iii.

We turn next to Varco's contention that Bohnsack's common law fraud theory cannot support the $600,000 in compensatory damages awarded by the jury. Varco argues that the compensatory damages reflect benefit-of-the-bargain damages, which are only permitted when the plaintiff has proven that he was fraudulently induced into a contract. We agree with Varco. Because a claim for common law fraud does not support the benefit-of-the-bargain damages awarded by the jury under the facts of this case, Bohnsack's theory of common law fraud cannot support the jury's award of compensatory damages.

Texas law recognizes three types of damages for fraud: out-of-pocket damages, consequential damages and benefit-of-the-bargain damages. *See Formosa Plastics*, 960 S.W.2d at 49. Out-of-pocket damages "allo[w] the injured party 'to recover the actual injury suffered measured by the difference between the value of that which he has parted with, and the value of that which he has received.'" *Id.* (citation omitted). Consequential damages permit plaintiffs to recover damages "that are foreseeable and directly traceable to the fraud and result from it" and must be properly pleaded and proved. *Id.* at 49 n.1. Benefit-of-the-bargain damages "derive from an expectancy theory" and "evaluate the difference between the value that was represented and the value actually received." *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007).

The situations in which benefit-of-the-bargain damages can be awarded are limited. Courts have refused to award benefit-of-the-bargain damages in the absence of an enforceable contract. *See Haase v. Glazner*, 62 S.W.3d 795, 798-99

17

(Tex. 2001); *Baylor Univ.*, 221 S.W.3d at 636 ("Thus, if the measure of damages Sonnichsen seeks for fraud are the benefit-of-the bargain damages he sought to recover for breach of contract, his fraud claim also fails."). Benefit-of-the-bargain damages are appropriate in cases of fraudulent inducement when they are satisfactorily proven. *See Formosa Plastics*, 960 S.W.2d at 49-50. While dicta in *Formosa Plastics* indicated that such damages are also available for common law fraud claims, *see id.*, the Texas Supreme Court has subsequently cast doubt on that language: "Although economic losses may be recoverable under either fraud or fraudulent inducement, *Formosa Plastics* should not be construed to say that fraud and fraudulent inducement are interchangeable with respect to the measure of damages that would be recoverable." *Haase*, 62 S.W.3d at 798-99. From the context, it is clear that *Haase* was referring to benefit-of-the-bargain damages. *See id.* Thus, according to *Haase*, benefit-of-the-bargain damages are normally not appropriate measures of damages for common law fraud claims.

In this case, the damages awarded to Bohnsack for fraud were all benefit-of-the-bargain damages. The jury was specifically instructed that compensatory damages can be awarded only on the basis of benefit-of-the-bargain damages:

> Consider the following elements of damages, if any, and none other: Bohnsack's Loss of the Benefit of the Bargain with Varco[.] Benefit of the bargain damages are damages which give Bohnsack the benefit of his contract or bargain with Varco. You can only award Bohnsack these damages if Bohnsack has proven these damages with a reasonable certainty.

These jury instructions require us to presume that the jury's award of damages reflects only benefit-of-the-bargain damages. *See ClearOne Commc'ns v. Biamp Sys.*, Nos. 09-4097, 10-4090, 10-4168, 2011 WL 3437796 (10th Cir. 2011) (applying presumption that juries follow instruction to assessment of jury's award of damages); *cf. United States v. Gallardo-Trapero*, 185 F.3d 307, 321 (5th Cir. 1999) (discussing presumption that juries follow cautionary instructions).

Because benefit-of-the-bargain damages compensate litigants only for injuries that arise out of an enforceable contract, the jury instructions only support damages for injuries that depend on Bohnsack having entered into a contract with Varco. Put another way, the jury instructions prevent Bohnsack from receiving compensation for injuries that do not arise out of an enforceable contract. Bohnsack argues here that he suffered lost revenues because he could have produced the Pit Bull in conjunction with other companies during the time he was negotiating with Varco. While injuries in the form of lost profits are cognizable under Texas law, they are appropriately compensated through consequential damages, not benefit-of-the-bargain damages. *See Formosa Plastics*, 960 S.W.2d at 49 n.1 (consequential damages can "include foreseeable profits from other business opportunities lost as result of the fraudulent misrepresentation.") Here, consequential damages are not available to Bohnsack. They were not permitted by the jury instructions, and Bohnsack did not object to the jury instructions. *See 50-Off Stores, Inc. v. Banques Paribas (Suisse), S.A.*, 180 F.3d 247, 256 n.12 (5th Cir. 1999) (holding that where party did not preserve objection to jury instructions regarding damages, issue was waived). In addition, there is no indication that Bohnsack pleaded or proved them in the manner required by Texas law. *See* Tex. R. Civ. P. 56. For these reasons, consequential damages cannot redress any of Bohnsack's injuries.

Putting aside the injuries that consequential damages arguably could have redressed if they had been properly pleaded and argued for, the remaining harm claimed by Bohnsack–that is, the harm arising out of the contract he purportedly entered into with Varco–is properly the subject of a fraudulent inducement claim, not a common law fraud claim. His harm cannot be compensated by benefit-of-the-bargain damages under a common law fraud theory. As we explained above, the Texas Supreme Court has cautioned against the provision of benefit-of-the-bargain damages to redress common law fraud claims. *Haase*,

No. 10-20741

62 S.W.3d at 798-99.    Fraud claims that depend on the existence of an enforceable contract are properly styled as fraudulent inducement claims, not common law fraud claims. *See id.*  The reason for this rule is made clear when Texas's definition of benefit-of-the-bargain damages is applied to the facts of this case.  Here, the difference between "the value that was represented and the value actually received," *Baylor Univ.*, 221 S.W.3d at 636, makes sense as a measure of Bohnsack's damages only in the context of a fraudulent inducement claim that alleges Bohnsack was misled as to what to expect from the contract. The terms of the contract purportedly entered into by Varco and Bohnsack contain the only "value that was represented" by Varco, so the only possible way in which Varco could have wrongly represented a value to Bohnsack was by fraudulently inducing him into a contract.  Accordingly, under these facts, common law fraud does not support the damages provided for by the jury instructions. *Cf. id.* ("The viability of [plaintiff]'s fraud claim depends upon the nature of the damages he seeks to recover.").    To decide whether the jury's award of benefit-of-the-bargain damages can stand, we must determine whether Bohnsack has proven a claim for fraudulent inducement.

**3.**

Varco provides two reasons that Bohnsack did not prove a claim for fraudulent inducement.  It argues, first, that Bohnsack did not prove he relied on any of Varco's misrepresentations when he entered into an agreement with Varco and, second, that no enforceable agreement existed between Bohnsack and Varco.  We need not reach Varco's second contention to hold that Bohnsack has not proven a claim for fraudulent inducement.

Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof.  That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties." *Haase*, 62

No. 10-20741

S.W.3d at 798-99.  As fraud claims require a plaintiff to prove that his injury arose out of his reliance on a fraudulent misrepresentation, fraudulent inducement claims require plaintiff to prove a misrepresentation; that defendant knew the representation was false and intended to induce plaintiff to enter into the contract through that misrepresentation; that plaintiff actually relied on the misrepresentation in entering into the contract; and that plaintiff's reliance led to plaintiff to suffer an injury through entering into the contract.  *See Samson Lone Star, Ltd. P'ship v. Hooks*, No. 01-09-00328-CV, 2011 WL 3918093, *11 (Tex. App. 2011).  In fraudulent inducement cases, the plaintiff must show that he would not have entered into the contract in the absence of the misrepresentation.  *See Williams v. Dardenne,* 345 S.W.3d 118, 126 (Tex. App. 2011).  For the purposes of this analysis, we assume without deciding that the offer proposed by Bohnsack on April 17, 2007 was accepted by Varco and became a binding contract.[12]

In Texas, a plaintiff must show that his reliance on the defendant's misrepresentations induced him to enter into a contract, not just contractual negotiations.  *See Williams*, 345 S.W.3d at 126-27; *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 716-718 (Tex. App. 2007) ("The supreme court's analysis makes clear that the basis of any fraudulent inducement claim *must be an executed contract that was procured by fraud, without which would not have been executed*, and the damages sought must flow directly from that contract.") (emphasis added).  This reliance must be a "material factor" in the plaintiff's decision to enter into a contract.  *See Coffel*, 284 F.3d at 636; Restatement (Second) of Torts § 546.

Bohnsack introduced no evidence and provides no argument supporting his contention that McClung's statements about Varco's patent application were

_____

[12]  If Bohnsack and Varco had not entered into an enforceable contract, no claim for fraudulent inducement would lie.  *See Haase*, 62 S.W.3d at 798-99.

21

a material factor in his decision to enter into a contract with Varco.  Bohnsack argues that McClung's statement was fraudulent because it prevented him from learning that Varco had improperly deprived him of his intellectual property rights.  Bohnsack does not, however, show how his belief that Varco had not filed a patent application for the Pit Bull led him to enter into a contract with Varco. In fact, it would be more logical for Bohnsack to be induced into a contract with Varco if he had been led to believe that Varco had improperly deprived Bohnsack of his intellectual property rights, because the terms of the contract could partially rectify that wrong by paying Bohnsack for those rights.  Thus, if anything, McClung's false statements regarding the submission of the patent application made Bohnsack less likely to enter into a contract with Varco, not more.  That Bohnsack's decision to enter into the contract occurred two years after the misrepresentations at issue casts further doubt upon the causal relationship between the misrepresentations and Bohnsack's decision to enter into a contract.  At most, McClung's statements led Bohnsack to trust and continue negotiating with Varco.  But this only demonstrates that Varco's misrepresentations led Bohnsack to enter into negotiations, which is not enough to establish fraudulent inducement under Texas law. *ISG State Operations*, 234 S.W.3d at 716-718.  False statements that build a plaintiff's trust during negotiations but are not a "material factor" in his decision to enter into a contract cannot form the basis for a fraudulent inducement claim. *See Coffel*, 284 F.3d at 636.  Bohnsack's argument is therefore unavailing.

Further, Bohnsack has not shown that Varco entered into the contract without intending to perform the contract.  "[A] contract may be induced by fraud when a party promises to perform the contract while knowing that it has no intention of carrying out the promise." *DeWitt Cnty. Elec. Co-op, Inc. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999).  Bohnsack points to no evidence, however, regarding Varco's intent at the time it entered into the contract with Bohnsack.

No. 10-20741

Without evidence that Varco entered into a contract with intent not to perform the contract, a claim for fraudulent inducement is unavailable on this theory. *See Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 859 (5th Cir. 2004).

As it lacks evidence of fraudulent inducement and fraudulent intent, Bohnsack's action properly sounds in contract, not tort. *See Baylor Univ.*, 221 S.W.3d at 636 (criticizing "artful pleading" that "morphs contract claims into fraud causes of action to gain favorable redress under the law."). Even after we draw all reasonable inferences in favor of the jury's verdict, we must conclude that Bohnsack has not proven a claim for fraudulent inducement.

### 4.

For these reasons, we hold that a fraudulent inducement claim cannot lie, and Bohnsack has not proven damages for common law fraud. The district court erred in denying Varco's motion for judgment as a matter of law on the damages awarded to Bohnsack based on the fraud verdict. The only result supported by the record is a take-nothing judgment for fraud.

### B.

Varco also contends that the district court erred by denying judgment as a matter of law on Bohnsack's claim for misappropriation of trade secrets. The elements of misappropriation of trade secrets are the following: "(1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App. 2004) (citations omitted). Varco argues that Bohnsack proved neither use of the trade secret nor damages. We review the district court's denial of the motion for judgment as a matter of law to determine whether a reasonable jury had a legally sufficient basis in the evidence to find that Varco had misappropriated trade secrets. *Pineda*, 360 F.3d at 486.

No. 10-20741

**1.**

Varco first contends that Bohnsack presented no evidence that Varco used the trade secret.    We have relied on the Restatement test to determine what constitutes a "use":

> Any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section.  Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute "use."

*Gen. Universal Sys. v. HAL, Inc.* 500 F.3d 444, 450 n.4 (5th Cir. 2007) (interpreting Texas law) (quoting Restatement (Third) of Unfair Competition §40 cmt. c).[13]

Under this broad definition of "use," a reasonable jury had sufficient evidence to conclude that Varco exploited Bohnsack's idea for the Pit Bull in a way "that [was] likely to result in injury to the trade secret owner or enrichment to the defendant." *See id.* Bohnsack presented evidence tending to show that he asked Varco not to file the declaration that provided McClung with an exclusive interest in the Pit Bull.  Evidence further demonstrated that Varco produced agitators that would have competed with the Pit Bull for market share had another company manufactured the Pit Bull on a large scale.  It is common sense that when Varco has obtained rights to obtain profits from the Pit Bull, Varco's competitors become significantly less interested in compensating

---

[13] Some Texas courts have applied the "control and domination" test.  *See Garth v. Staktek Corp.*, 876 S.W.2d 545, 548 (Tex. App.–Austin 1994, writ dism'd w.o.j.).  However, we have previously rejected this test because "[t]his definition . . . has never been employed or approved by the Texas Supreme Court and is not widely used in Texas courts otherwise.  Further, it unnecessarily confuses the standard used to define conversion." *Gen. Universal Sys.*, 500 F.3d at 450 n.4 (citation omitted).  We agree with the conclusion of *General Universal Systems* that the Texas Supreme Court would adopt the Restatement test.

No. 10-20741

Bohnsack for the use of the Pit Bull. From these facts, a reasonable juror could infer that Varco's act of filing a patent application to the Pit Bull was "likely to result in injury to the trade secret owner" because it lowered the market value of Bohnsack's invention. *See id.* Further, by making it less likely that Bohnsack would sell his invention to Varco's competitors, its decision to pursue rights to the Pit Bull was "likely to result in . . . enrichment to the defendant" by protecting Varco from competition to the agitators it produced. *See id.* We therefore hold that a reasonable jury had sufficient evidence that Varco's actions constituted a "use" in this case.

**2.**

Varco also argues that Bohnsack did not present evidence of damages caused by Varco's use of the Pit Bull. Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits, *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 89-90 (Tex. 1973); the defendant's actual profits from the use of the secret, *Elcor Chem. Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204, 214 (Tex. Civ. App. 1973); the value that a reasonably prudent investor would have paid for the trade secret, *Precision Plating & Metal Finishing Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262, 1263-64 (5th Cir. 2006); the development costs the defendant avoided incurring through misappropriation, *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535-36 (5th Cir. 1974) (applying Georgia law);[14] and a "reasonable royalty," *Elcor Chem. Corp.*, 494 S.W.2d at 214. This variety of approaches demonstrates the "flexible" approach

---

[14] Although *University Computing* was applying Georgia law, we have previously described the case as persuasive authority for interpreting Texas law because the misappropriation of trade secrets doctrine in both Georgia and Texas are based on the Restatement of Torts. *See Carbo Ceramics, Inc. v. Keefe*, 166 F. Appx. 714, 722 n.4 (5th Cir. 2006) (unpublished). Additionally, *University Computing* has been cited by a Texas appellate court in interpreting Texas law. *See Garth v. Staktek Corp.*, 876 S.W.2d 545, 548 (Tex. App. 1994).

used to calculate damages for claims of misappropriation of trade secrets. *See Univ. Computing*, 504 F.2d at 535.

Bohnsack has sufficiently proven that he is entitled to $600,000 in damages for the misappropriation of trade secrets verdict. Varco argues that Bohnsack must prove his precise damages to recover for misappropriation. This is incorrect. *See id.* at 539 ("Where the damages are uncertain, however, we do not feel that the uncertainty should preclude recovery."). A jury need only have sufficient evidence to determine the value a reasonably prudent investor would pay for the trade secret. Here, the final terms negotiated between Varco and Bohnsack are sufficient evidence to prove the value of the Pit Bull to a reasonably prudent investor. Those terms demonstrated Varco's willingness to pay at least $600,000, and possibly much more, for the Pit Bull. The terms were the result of a long, careful process involving significant testing of the Pit Bull and years of negotiation. Further, even if the final terms did not represent a contract, one senior officer at Varco effectively deemed these terms to represent an "agree[ment] in principle." Thus, the jury had sufficient evidence to infer that a reasonably prudent investor would have been willing to pay at least $600,000 for the rights to use the Pit Bull. The district court did not err when it denied judgment as a matter of law on Bohnsack's claim for misappropriation of trade secrets.

## C.

Finally, Varco challenges the denial of judgment as a matter of law on the jury's award of punitive damages. The jury instructions limited punitive damages to Bohnsack's fraud claim. Because we have found that Bohnsack is not entitled to compensatory damages for fraud, no punitive damages can be awarded on that claim. *See Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995) ("[A]ctual damages sustained from a tort must be proven before punitive damages are available."). We therefore hold that the district court

No. 10-20741

erred in denying Bohnsack's motion for judgment as a matter of law on the award of punitive damages.

## III.

For the foregoing reasons, we AFFIRM the jury's award of compensatory damages for misappropriation of trade secrets. We REVERSE the jury's award of compensatory damages on Bohnsack's fraud claim and RENDER a take-nothing judgment, and we REVERSE the jury's award of punitive damages.